# THOMAS *v.* STATE

[No. 110, October Term, 1954.]

*Decided March 25, 1955.*

The cause was argued before BRUNE, C. J., DELA-PLAINE and COLLINS, JJ.

*Bernard J. Flynn,* with whom was *U. Theodore Hayes,* on the brief, for appellant.

*Stedman Prescott, Jr.,* Assistant Attorney General, with whom were *C. Ferdinand Sybert,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City, *J. Robert Brown* and *Julius A. Romano,* Assistant State's Attorneys, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by William C. Thomas, appellant, from a judgment and sentence of death for murder in the first degree.

Four indictments were returned against the appellant on February 11, 1954, by the Grand Jury for Baltimore City. The first indictment charged the appellant in the first and only count with murder in the first degree of Della Honeyman on January 17, 1954. The second indictment charged the appellant in the first count on the same date with rape of Della Honeyman; in the second count with assault with intent to rape; and in the third count with assault. The third indictment charged the appellant in the first count on the same date with robbery of the said Della Honeyman; in the second count with assault with intent to rob; in the third count with assault; in the fourth count with larceny; and in the fifth count with receiving stolen goods. The fourth indictment charged the appellant in the first count on the same date with burglary of the dwelling house of the said Della Honeyman; in the second count with being a rogue and vagabond; and in the third count with receiving stolen goods.

On May 24, 1954, the appellant was arraigned and entered a written plea of not guilty by reason of insanity to each of the charges as set forth in the indictments and to each and every count thereof.

The State elected to proceed to trial on the first indictment and on the first count of each of the other indictments. A jury was empanelled and sworn and the case heard on three successive days. At the end of the State's case on May 26, 1954, the appellant made a motion for an instructed verdict of not guilty, which motion was

overruled. The appellant then produced his evidence. At the end of his case he again moved for an acquittal, which motion was overruled. On May 26, 1954, the jury returned a verdict of guilty of murder in the first degree, rape, robbery, and burglary. After a motion for a new trial was refused by the Supreme Bench of Baltimore City, the appellant on October 8, 1954, was sentenced to death.

The appellant, at the time of the alleged crimes, was thirty-two years of age. He could not read or write, other than write his name. He left school in the third grade. As a young boy he had been confined in the Cheltenham Reformatory. Shortly before the commission of the crimes here he finished serving a fifteen year term in the Maryland Penitentiary for robbery. He stated in his confession that shortly after midnight of January 16, 1954, he had been drinking. He knocked the window out at the back entrance of 1515 North Gilmor Street in Baltimore with his fist. For the purpose of getting money, he went into the store part. He got some money out of a drawer there. Miss Honeyman, the owner, came into the store "from the back" where she was sleeping. He ran back to the front part of the store and she followed him. She grabbed him and he grabbed her and threw her down back of the counter. He then grabbed her on the bosom and felt a bag there about as big as his fist. He choked her and took the bag. She screamed and he hit her head against the floor and raped her. He held his hand over her mouth so that people passing the store would not hear her screams. When testifying he denied he raped her. He then ran out of the store. He found that the bag contained a large sum of money in fifty and one hundred dollar bills. He went home and sneaked in the cellar and went to sleep. He awoke at daybreak and went upstairs and gave his mother his coat, which was torn and on which there was blood, and told her to burn it. He told his family that he had "hit the numbers", evidently meaning that he had won the money gambling.

He gave his mother $150.00, his sister $400.00, and his girl friend $100.00. He also gave large sums of money to other friends. With other friends he took a trip to Philadelphia and New York, he paying the expenses. He bought clothes in New York. On his return to Baltimore he had $1,900.00 left which was stolen from him. He had heard on the radio the day after the attack that Miss Honeyman was dead and he said that was the reason he gave the money away.

The report of Dr. Russell S. Fisher, Department of Post Mortem Examiners, gave the cause of death as "asphyxia due to manual strangulation." Also there were multiple contusions of the head, face, extremities and right breast. There were extensive lacerations and contusions of perineum, vagina and rectum.

The appellant objects to the following part of the charge given by the trial judge to the jury: "Sanity in the Maryland law is defined as the ability to distinguish right from wrong and understand the consequences of acts as applied to one's self. The test that you must apply is this: At the time of the commission of these acts did the defendant have capacity and reason sufficient to enable him to distinguish between right and wrong, and to understand the nature and consequences of his acts as applied to himself? If at the time he did those things he did have the capacity and reason sufficient to enable him to distinguish between right and wrong and understand the nature and consequences of his acts as applied to himself, then he is a responsible agent and is subject to the criminal law of Maryland, and is sane. But if, at the time of the commission of these offenses, he did not have the capacity and reason sufficient to enable him to distinguish between right and wrong and understand the nature and consequences of his acts as applied to himself, then he is not a responsible agent. He is not subject to the criminal law of Maryland, and he is insane." The appellant's claim of insanity is based largely on the following parts of the testimony of Dr. Manfred Guttmacher, Chief Medical

Officer of the Supreme Bench of Baltimore City, a psychiatrist, to whom appellant had been referred for examination: "* * * poor intellectual endowments but not clearly mentally defective. Cannot read or write. Certainly could conclude from these examinations that the patient is not so defective that he would not realize that it was wrong and illegal to rob, rape and murder. * * * I felt that the patient had sufficient intellectual capacity to know that it was morally and legally wrong to rape, murder, rob or any of the acts of which he is accused, and that he did have sufficient capacity to realize that at that time if he were apprehended he would be punished for these acts. * * * A. I would say of course I think it is highly unlikely that he thought about the nature and consequences of these things at that time, but I think the legal test as I understand it is whether he had the type of mentality which would have made it possible for him had he taken the precaution and time to do so to figure out what he was doing was wrong and that he would get punished for it. I think, of course, it is a very difficult decision to make. First, you find absolutely no evidence here of a psychosis, insanity. The only thing one has here is a man who has poor intelligence. I do not feel that the man's intelligence is sufficiently poor so that he would not have had the capacity at that time under these extraordinary conditions to have been able to foresee the consequences. * * * A. * * * I think he had sufficient capacity to do that. I don't claim he figured that at the time he was aware of all the consequences but I think he had sufficient capacity to make such a distinction. * * * A. * * * certainly psychiatry doesn't consider these people insane, and I don't think the law considers these people irresponsible. * * * A. * * * He gives evidence of having an undesirable character structure, probably based on life experiences, and also having quite poor intellectual endowments, but not poor enough to consider him actually feeble minded or mentally defective."

The appellant also relies on the testimony of other witnesses to the effect that at times, before the commission of the offenses here, when drinking, he became hostile and at one time, when drinking and very angry, started toward his mother with a butcher knife and threw the radio against the wall. Counsel for the appellant argues that the jury in determining appellant's insanity should take into consideration these hostile tendencies of the appellant when under the influence of alcohol, and the fact that he gave money to persons to whom he was in no way obligated. Appellant also argues that the jury should have been permitted to take into consideration the question of malice, deliberation, and premeditation.

Dr. Guttmacher, in explaining the effect of alcohol on certain individuals, said under cross-examination: "Well, the general feeling among psychologists is that alcohol does not create anti-social drives, but that someone had referred to it as a conscience solvent. It dissolves the brake lining, as it were. It releases strong tendencies which had been there before and kept under pretty good control. But when an individual with these tendencies drinks his controls become much more defective, and that is what I meant. * * * It certainly weakens his controls, and the degree to which it weakens them varies in certain individuals." Dr. Guttmacher further testified that he found that, although appellant had poor intelligence, he was not considered "actually feeble minded or mentally defective." The appellant himself stated that the reason he gave away the money was because he learned that Miss Honeyman was dead. He evidently thought that by disposing of the money, he would escape detection by not having the money found on his person. As to the argument that the jury should have been permitted to take into consideration the question of malice, deliberation and premeditation, the appellant here admitted that he broke into the premises for the purpose of robbery. Code, 1951, Article 27, Section 497, provides: "All murder which shall be committed in the

perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, or in the escape or attempt to escape from the Maryland Penitentiary, the House of Correction, the Baltimore City Jail, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree."

The instruction given by the trial judge to the jury is based upon what is generally known as the "right-wrong test", which was originally adopted in this State in 1888 in the case of *Spencer v. State,* 69 Md. 28, 13 A. 809, which has since been the cornerstone in the law here on the question of criminal responsibility of an accused claiming to be insane. That case has been consistently followed by the courts of Maryland. It was said in that case by Chief Judge Alvey, Judge Bryan dissenting: "Was the evidence admissible to prove insanity, that is to say, such condition of mind, as, by the law of the land, would render the prisoner irresponsible for his acts? There has been, and is still, a great variety of opinion entertained upon this subject, and especially among members of the medical profession who have written upon the subject of medical jurisprudence. Doubtless the subject has been much elucidated by the repeated discussions that have taken place. But, in Courts of justice where definite principles, and not mere theories, must be given practical application, and that too with a view to the safety of society, as well as for the protection of the particular individual accused, tests that have received the sanction of experience and the approval of the ablest jurists of our age, must be accepted and applied as the established law. And according to the law, as we find it settled by the great preponderance of judicial authority, if the party accused be competent to form and execute a criminal design; or, in other words, if at the time of the commission of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong; and understand the nature and consequences of his act, as applied to himself, he is a responsible agent, and amenable to the

criminal law of the land for the consequences of his act. This is the leading test as applied by the courts of England, and certainly by a very large majority of the courts in this country.

"In the very celebrated case of *McNaughton,* 10 Cl. & Fin. 200, which occurred in 1843, [*Regina v. McNaughton,* 10 Cl. & F. 200, 8 Eng. Rep. 718], the accused was indicted for shooting Mr. Drummond, the private secretary of Sir Robert Peel, the secretary being mistaken for Sir Robert himself. The party was defended, and acquitted, upon the theory of the existence of an insane delusion as to some imaginary persecution that he was suffering at the hands of Sir Robert Peel, whom he determined to kill. The case excited great interest, and it occasioned a very earnest debate in the House of Lords, upon the state of the law of insanity, as applied in the administration of criminal justice. The opinion of all the judges was taken, in the form of answers to certain questions propounded; and, by that opinion, it was laid down as the settled law, and fully approved by the House of Lords, that notwithstanding a party may do an act, being in itself criminal, under the influence of an insane delusion, with a view of *redressing or revenging some supposed grievance, or injury,* or of promoting some public good, he is nevertheless punishable, if he had the capacity to distinguish between right and wrong, *and knew at the time that he was acting contrary to law.* Therefore, if the party accused be conscious that the act was one that he ought not to do, that act being contrary to law, he is punishable under the law. The law thus laid down furnishes the test in England, and it has been very generally accepted by the courts in this country." (Italics supplied). This quotation was followed by this Court as recently as 1946 in the case of *Taylor v. State,* 187 Md. 306, 49 A. 2d 787. See also *State v. Garver,* (Oregon, 1950), 225 P. 2d 771, 27 A. L. R. 2d 105, in which the doctrine of irresistible impulse as a defense to crime was rejected, and *Fisher v. Fraser,* (Kansas, 1951), 233 P. 2d 1066. Apparently the latest English

case to apply the McNaughton rule is *Swan v. Swan,* (1953), 2 All E. R. 854, a cruelty-divorce case.

The appellant, through his able court appointed attorney, relies on the case of *Durham v. United States,* 214 F. 2d 862, decided July 1, 1954, by the Court of Appeals for the District of Columbia. In that case Durham was convicted in July, 1951, for housebreaking by the District Court sitting without a jury. Durham had had a long history of imprisonment and hospitalization. He had been discharged from the Navy in 1945 at the age of 17 when a psychiatric examination had shown that a profound personality disorder rendered him unfit for Naval service. Between 1947 and 1951 he committed three crimes. In 1948 he was committed to a mental institution when a jury found him to be of unsound mind. He was discharged from the mental institution after fifteen months and returned to jail. In June, 1950, he was conditionally released. He violated the conditions. He was then referred to the District Court for a lunacy inquisition and a jury again found him to be of unsound mind. He was readmitted to the mental institution in February, 1951. He was discharged from there again in May, 1951. The crime for which he was here charged was committed two months later. The District Court applied the so-called "right-wrong rule" and also held that, although the burden of proof was upon the Government to prove mental capacity, there was not sufficient evidence to contradict the usual presumption and inference of sanity. The Court of Appeals found in that case that the right-wrong rule was inadequate and held that the New Hampshire rule, adopted there in 1870 in *State v. Pike,* 49 N. H. 399, was to apply to that and future cases and said: "It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect" and ordered a new trial. It was also held in that case that the opinion of a psychiatrist, that appellant had been of unsound mind when the crime was committed, was sufficient to satisfy the "some evidence" test and

therefore to shift to the prosecution the burden of proof of appellant's sanity.

The *Durham* case, *supra,* was followed by *Stewart v. United States,* 214 F. 2d 879, Court of Appeals, D. C., decided July 15, 1954. In that case Stewart was convicted on an insanity plea in the District Court for first degree murder committed in robbing a grocery store, and appealed. There had been testimony of frequent outbursts of exaggerated and purposeless violence. A psychiatric witness for the defense testified that in his opinion appellant was suffering from a manic depressive psychosis at the time of the crime and, although he probably knew right from wrong, he was unable to control his conduct "in the light of such knowledge." On the other hand two psychiatrists testified for the Government that, although appellant was of very limited intelligence, approaching or within the feeble-minded range, he had no psychosis or neurosis, was able to distinguish between right and wrong, and was not under the pressure of an irresistible impulse. The District Court had instructed under the "right-wrong" rule and also that "the law does not recognize as insanity a mental disorder unless it is a real mental disease." The Court of Appeals held that the District Court's attempted distinction between "mental disease" and "mental disorder" was "at least confusing", and remanded the case for a new trial. See also *Wear v. United States,* U. S. Court of Appeals for the District of Columbia, No. 11761, (July 22, 1954), 218 F. 2d 24.

For discussions of the *Durham* and *Stewart* cases, *supra,* see 68 *Harvard Law Review* 364-366, (December, 1954); 40 *Virginia Law Review* 799-800, (October, 1954); 54 *Columbia Law Review* 1153-1156, (November, 1954); 43 *Georgetown Law Journal* 58-67, (November, 1954); 23 *George Washington Law Review* 225-228, (December, 1954); and 40 *Cornell Law Quarterly* 135-141, (Fall, 1954).

There is no constitutional question involved here. In *Fisher v. United States,* (1946), 328 U. S. 463, 66 S. Ct.

1318, 90 L. Ed. 1382, the appellant had been convicted of first degree murder of a woman on church grounds in Washington, D. C., because she had reported that he was not doing his work properly. The appellant contended in the Supreme Court that his mental and emotional qualities were such at the time of the crime that he was incapable of deliberation and premeditation, although he was then sane in the usual legal sense. The Supreme Court there found that from the evidence of the psychiatrists for the defense, the jury might have concluded that the appellant was mentally somewhat below the average with minor stigmata of mental subnormalcy. The Supreme Court there said: "We express no opinion upon whether the theory for which petitioner contends should or should not be made the law of the District of Columbia. Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in matters not affected by constitutional limitations or a general federal law is a matter peculiarly of local concern." It was said by the Supreme Court of the United States in *Leland v. Oregon*, (1952), 343 U. S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002: "The science of psychiatry has made tremendous strides since that test was laid down in M'Naughton's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. * * * This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.' "

The appellant also objects to the following part of the charge given by the trial judge to the jury: "The burden of proof of insanity lies upon the defendant. You have heard the evidence, both from Dr. Guttmacher, who is a psychiatrist, and from other witnesses who have testi-

fied as to his conduct. The burden is upon the defense to prove insanity by a preponderance of the evidence, not beyond a reasonable doubt." Of course, the law presumes every man innocent of crime and the burden is upon the prosecution to overcome this presumption. The appellant cites *Hochheimer's Criminal Law*, Section 189, 1911 Ed., under "Burden of Proof". It is there said: "It is immaterial, in this regard, that he sets up a defense by way of justification or excuse in the nature of a confession and avoidance, as where he relies on the defense of insanity * * *." *Davis v. United States,* 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499. However it is said in *Wharton's Criminal Law,* Vol. 1, Twelfth Edition, Section 78: "By the common law, every man is presumed to be sane until the contrary be proved, and the better opinion is that when insanity is set up by the defendant, it must be proved as a substantive fact by the party alleging it, on whom lies the burden of proof. The finding of an inquisition of lunacy, which is admissible, shifts the burden." It is said in *Underhill's Criminal Evidence,* 4th Ed., Section 304: "But the prevailing rule seems to be that an allegation that the defendant is insane is a statement of an independent fact, and is, in its nature, a plea of confession and avoidance. Hence, if insanity is pleaded as a defense, the burden of proof is on the defendant, in conformity with the general rule that he who asserts any affirmative fact has the burden of proof, and if he fails to prove his insanity, he is presumed sane." 40 *C. J. S.,* Homicide, Section 194.a, Insanity, says: "While in some jurisdictions the state has the burden of proof of sanity of the accused, ordinarily the burden of proof of insanity relied on as a defense is regarded as resting on the accused." Even in the *Durham* case, *supra,* upon which the appellant so strongly relies, the following is quoted from *Tatum v. United States,* (1951), 190 F. 2d 612: "When lack of mental capacity is raised as a defense to a charge of crime, the law accepts the general experience of mankind and presumes that all people, including

those accused of crime, are sane. So long as this presumption prevails the prosecution is not required to prove the defendant's sanitay. But as soon as some evidence of mental disorder is introduced, * * * sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt."

The so-called "Spencer" or "right-wrong test" has been followed consistently in this State for many years and should not be changed unless we are convinced that it is not a true test. *Gillespie v. State*, 147 Md. 45, 59, 60, 127 A. 727; *Townsend v. Bethlehem-Fairfield Shipyard, Inc.*, 186 Md. 406, 417, 47 A. 2d 365. Here, the medical testimony is merely that the appellant has quite poor intellectual endowments, "not poor enough to consider him actually feeble minded or mentally defective." There is no evidence of a mental disease or mental defect to satisfy the New Hampshire rule adopted in the *Durham* and *Stewart* cases, *supra*, which we do not here adopt. Alcohol has the effect of "releasing the brakes", not only on insane persons but on those of more than normal mentality. We adhere to the right-wrong rule.

As to the burden of proof instruction given by the trial judge, there is no evidence here of any mental disorder to shift the burden of proof to the State, as in the *Durham* and *Stewart* cases, *supra*, even if we decided to follow the rule laid down in those cases as to burden of proof, which we do not decide. The charge of the trial judge was correct. As there appears to be no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*