COMMONWEALTH *vs.* JACK CHESTER.

Norfolk.    March 3, 1958. — June 10, 1958.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN,
& WHITTEMORE, JJ.

*Insanity. Homicide. Practice, Criminal,* Appeal, Capital case.

An appeal from the denial of a motion for a new trial of a capital case,
accompanied by an assignment of error based on an exception to the
denial, brought the whole case to this court for review under G. L.
c. 278, § 33E.   [704]

This court in a capital case adhered to the rule for determining criminal
responsibility laid down in *Commonwealth* v. *Rogers,* 7 Met. 500.   [711–
713]

Upon a review by this court under G. L. c. 278, § 33E, justice did not re-
quire a new trial of a capital case in which it was undisputed that the
defendant shot and killed a young woman to whom he had once been
engaged and the only issue was his criminal responsibility;  there was
evidence of their relations over a period of several years, of the events
leading to the killing, and of his emotional and psychiatric background
since childhood;  there were conflicting opinions by experts for the Com-
monwealth and for the defence respecting his criminal responsibility;
and the judge instructed the jury in accordance with the rule laid down
in *Commonwealth* v. *Rogers,* 7 Met. 500.   [713–714]

INDICTMENT, found and returned on September 6, 1957.

The indictment was tried in the Superior Court before
*Donahue,* J.

*Louis Goldstein,* (*David Feinstein* with him,) for the de-
fendant.

*Myron N. Lane,* District Attorney, (*Edward H. Libertine,*
Assistant District Attorney, with him,) for the Common-
wealth.

SPALDING, J.   Early in the afternoon of April 20, 1957,
the defendant shot and killed Beatrice R. Fishman at her
home in Brookline.   Under an indictment charging murder,
the defendant was found guilty of murder in the first degree.
Since the jury made no recommendation (see G. L. c. 265,
§ 2, as amended through St. 1951, c. 203) a sentence of

death was imposed, and the execution of the sentence was stayed, as required by G. L. c. 279, § 4, as amended through St. 1955, c. 770, § 92. The case comes here on two appeals, with a summary of the record, a transcript of the evidence, and an assignment of errors under G. L. c. 278, §§ 33A–33G, as amended.

No exceptions were taken during the trial. Within a few days after the verdict the defendant filed a motion for a new trial. Before this motion was heard, the defendant seasonably filed a claim of appeal (hereinafter called the first appeal) under § 33B, "being aggrieved by the verdict which was against the weight of the evidence and the law" and which if it was allowed to stand "would work a miscarriage of justice." The motion for a new trial was denied after hearing and the defendant duly excepted and filed his second claim of appeal, assigning as error the denial of the motion. Thereafter, upon the Commonwealth's motion, the defendant's first appeal was dismissed, presumably on the ground that since there were no exceptions taken at the trial there was no basis for an appeal. Thereupon the defendant filed his third claim of appeal, alleging that he was aggrieved by the dismissal of his first appeal.

The question whether the first appeal was rightly dismissed may be summarily dealt with. In general it may be said that under the procedure prescribed by §§ 33A–33G "An exception not included in the assignment of errors and an assignment of errors not based upon an exception" bring nothing to this court to review. *Commonwealth* v. *McDonald,* 264 Mass. 324, 336. *Commonwealth* v. *Polian,* 288 Mass. 494, 496–497. *Commonwealth* v. *Taylor,* 319 Mass. 631, 633. But compare *Commonwealth* v. *Conroy,* 333 Mass. 751, 757, where it was stated that "in appropriate instances this court has and will exercise the power to set aside a verdict or finding in order to prevent a miscarriage of justice when a decisive matter has not been raised at the trial." Whether the broad review which, under § 33E, this court is required to exercise in a capital case can be had upon an appeal, such as the first appeal here,

where there are no exceptions and no assignment of errors, is a question that we need not decide. See *Commonwealth* v. *Gricus,* 317 Mass. 403. Compare *Commonwealth* v. *MacGregor,* 319 Mass. 462. It was conceded by the defendant's counsel at the arguments that the appeal from the denial of the motion for a new trial, which is accompanied by an assignment of error based on an exception, affords the same opportunity for review under § 33E as would be open under the first appeal if it were properly here. We agree.

We turn now to the appeal from the denial of the motion for a new trial. Various grounds were set forth in the motion, but counsel for the defendant in his brief states that the "only issue in this case is the criminal responsibility of the defendant." For reasons which will appear hereinafter in our consideration of the case under § 33E, we are of opinion that the judge did not err in denying the motion for a new trial.

Section 33E provides that the entry of a capital case in the Supreme Judicial Court "shall transfer to that court the whole case for its consideration of the law and the evidence" and that "the court may order a new trial if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require." The scope of the review under this provision has been discussed in *Commonwealth* v. *Gricus,* 317 Mass. 403, 406–407, and *Commonwealth* v. *Cox,* 327 Mass. 609, 614–615.

We proceed to a consideration of the case in the light of our power and duty under § 33E.

That the defendant shot and killed Beatrice R. Fishman in the early afternoon of April 20 is not in dispute. The defendant shortly after the shooting gave himself up to the police and told them what he had done. At the trial he took the stand and testified that he had shot Miss Fishman. There was evidence that Miss Fishman's mother saw the defendant with a pistol in his hand standing at the front door of her home immediately prior to the shooting; that

she heard a noise and then saw her daughter fall to the floor; and that she opened the door and observed the defendant running toward his automobile. A pistol was found in the defendant's automobile by the police in a place where the defendant said it would be, and the bullets found in Miss Fishman's body and at the scene of the crime came from that pistol.

From evidence introduced at the trial, the following could have been found: The defendant first met Miss Fishman about six years prior to her death. She was then about twelve years of age and he was about sixteen. At some time prior to May, 1952, when the defendant entered the Air Force, he and Miss Fishman started "to go around together," and in December, 1954, while he was still in the service, they became engaged. He sent her an allotment from his pay to be put into a joint bank account. Excerpts from her letters indicate that they had great affection for each other.

On his return to this country from Japan, the defendant obtained a job in an aircraft factory in California. In the latter part of June, 1956, he flew to Boston and was met at the airport by Miss Fishman and her parents. He told them that he wanted to marry Miss Fishman as quickly as possible and then go to his job in California. This plan was agreed upon and arrangements were made for the wedding. Shortly before the time set for the wedding Miss Fishman was injured in an automobile accident while riding with the defendant, and was hospitalized for two weeks. The wedding was postponed and the defendant, unable to find work in the east, returned to California in the latter part of July.

There were further postponements of the wedding for reasons that need not concern us, and in October the defendant became "very perturbed" and decided that he and Miss Fishman "were through." He told her she could keep all that he had given her except the wedding ring. For one reason or another she never returned the ring and it was in her possession at her death.

Between October and the following April, the defendant was very unhappy. He went with other girls, but none of them could replace Miss Fishman. He tried to bring about a reconciliation, but Miss Fishman seemed indifferent. She still failed to return the wedding ring, however. He started to drink heavily and use marijuana. Sometime before April, he bought a pistol. His exact intention in doing so was not clear, but he had many thoughts on the subject. One was to kill himself; another was to threaten Miss Fishman with it if he could not get the ring back; still another was to kill her if he could find no solution to his anxiety.

The defendant decided to spend the week end of April 20 and 21, 1957, in Boston and purchased a round trip plane ticket. When packing his bag for the trip he put in the pistol. When he arrived in Boston on the evening of April 19 he went directly to the Fishman home in Brookline; he was told by her parents that she was "out on a date." The defendant stayed for some time talking with Mr. and Mrs. Fishman and when he stated that he wanted to stay until Miss Fishman returned they told him to come back the next day. He then left.

On the following day the defendant called at the Fishman home and talked with Miss Fishman and her mother. Miss Fishman told him that he had been away so long "she didn't know . . . [him] any more," but if he returned to Boston to live they "could get reacquainted." The defendant asked Miss Fishman to return the ring and she told him it was in a safe deposit vault, and he could have it Monday. There was further conversation with her, during which he became very upset, and he felt that he had become entangled in an "utterly hopeless . . . and impossible situation" and that he wanted to kill Miss Fishman. But he "fought this emotion down," kissed her good-bye and walked out of the house.

The defendant, according to his testimony at the trial, went to a bar and had "two shots of Bourbon." According to his statement given to the police, he smoked two marijuana cigarettes but they made him only slightly "high"

and had no effect on his behavior; he knew what he was doing. In about half an hour he returned to the Fishman house in an angry mood. He "figured it out . . . [that he] couldn't live with her and . . . [he] couldn't live without her" and it did not make any difference. His intent was to "[blow] her . . . head off." He went to the front door with his pistol in his pocket and rang the doorbell. As Miss Fishman opened the door he had the pistol in his hand. Seeing it, she hesitated and then closed the door. Thereupon the defendant started pulling the trigger and kept on pulling it until he had fired nine shots through the door. Three of these entered the body of Miss Fishman, causing wounds from which she died within an hour. Shortly thereafter the defendant asked a policeman to arrest him as he had "just murdered someone."

The only defence relied on at the trial was that the defendant was not guilty by reason of insanity. Much evidence was introduced bearing on the defendant's emotional and psychiatric background. Anything approaching a complete summary of this evidence, which covers several hundred pages of the transcript, is not feasible. Some of the salient features of this evidence are as follows: The defendant's father died when the defendant was about five years old. His death was due to a head injury caused by a fall on the ice while running after the defendant who had left the house without his hat. The defendant thereafter had a feeling of guilt at having caused his father's death. During his boyhood, without a father, he was difficult to control and there was considerable friction between him and his mother. As a result of one dispute with his mother, the defendant, then aged twelve, drank a bottle of iodine. At the age of fifteen he sustained a serious injury to his eye from an air rifle. The injury affected his appearance and as a consequence he became very self conscious.

While in the service the defendant became very despondent because of his relations with Miss Fishman and at one time considered suicide. He was quite combative and frequently got into fights with other soldiers. Because

two airplane pilots lost their lives in the crash of planes on which he had done mechanical work, he felt responsible for their deaths. He felt that he was "no good," that everything he did would turn out badly, and that he would die young.

Two psychiatrists (Dr. Washburn and Dr. de Marneffe), who had examined the defendant, testified on his behalf. On the basis of the evidence recited above and other evidence, Dr. Washburn formed the following conclusions: The defendant had suffered from a serious mental illness since he was twelve years old and this condition obtained at the time he killed Miss Fishman. By serious mental illness he meant "an abnormal variation of a person's mood . . . thinking processes or . . . behavior." The defendant suffered from a personality disorder which has two sides: (1) passive obstructionism or agreeing to do something without ever intending to do it, and (2) overt, aggressive, uncontrolled outbursts, or giving vent to one's feelings with vigorous physical action toward others. While everyone has these tendencies the defendant possessed them to a marked degree. "Although . . . [the defendant] was intellectually aware of the nature and the social consequences of his deed before and at the time he shot . . . [Miss Fishman], he did not have a normal emotional awareness of the impact this act might have on his own life or hers." The defendant has had throughout his life strong feelings of anger which most of the time he has been able to repress. When these feelings have become more intense due to an intolerably frustrating situation "he swings into impulsive violent action over which he momentarily has no rational control and the reality consequences are of almost no significance to him."

Dr. de Marneffe testified that the defendant was suffering from a severe mental disease which he would call a personality disorder and that this disease had existed since the defendant was twelve years old. This disorder was "characterized by impulsive action of a very sudden onset." Another aspect of the disorder was the "profound depression

and guilt . . . [that the defendant] carried throughout this time."

A psychologist (Dr. Pierce) called by the defence testified, as the result of various tests given to the defendant, that, although he is of very superior intelligence, he has a personality disorder which includes an obsession of guilt and a "potential for self destructive . . . [or] suicidal behavior." He is very depressed and isolated and looks upon himself as a "worthless, empty person." He is emotionally unstable and is given to "violent outbursts of emotional expression outside of conscious control."

The prosecution called two psychiatrists (Dr. Quinn and Dr. Lindberg) who had examined the defendant, under G. L. c. 123, § 100A, commonly known as the Briggs law. Dr. Quinn testified that the defendant was "perfectly sane and had no mental illness or . . . psychosis." His "mood was normal," being neither depressed nor exhilarated and he suffered from no delusions or hallucinations. His attitude was normal, coöperative and friendly. His intellectual capacity was tested and found to be normal. In the opinion of the witness the defendant was sane and had no mental illness at the time he killed Miss Fishman.

Dr. Lindberg was of opinion that "the defendant was not suffering from any mental disease or defect which would affect his criminal responsibility" either at the time of his examination or on April 20 when he killed Miss Fishman. He further was of opinion that on the latter date the defendant knew what he was doing and knew the difference between right and wrong. He testified that he had heard the entire testimony of the defendant and that would not change his opinion; nor would it be changed by the history of the defendant brought to his attention on cross-examination.

The defendant took the stand and in the course of his testimony stated, "I want the members of the jury to understand one thing. I am not looking for your sympathy. I am not denying . . . [that] what I did to Beatrice Fishman was premeditated, cold blooded murder. The . . .

only thing that I want to establish is that at the time that I spoke with the district attorney and the officers in the Brookline police station I was very emotionally upset and that I wanted to go to the electric chair as quickly as possible. I have not changed my opinion."

After the charge the judge informed the defendant of his right to make a statement to the jury, following the time honored practice in capital cases (see *Commonwealth* v. *Stewart*, 255 Mass. 9, 14–15). Availing himself of the right, the defendant said: "It is my opinion that any decision other than guilty, guilty of murder in the first degree, with no recommendation for leniency, is a miscarriage of justice. That is all."

After the judge had completed the imposition of the death sentence the defendant said, "Thank you."

During the course of their deliberations the jury came into court and asked the judge if they could have a transcript of his charge. The judge informed the jury that no transcript of the charge had then been made and that it was not the practice to furnish juries with transcripts either of the evidence or of the charge.

The following colloquy then took place: "THE JUDGE: Now, was there something that the jury was in doubt about as to the law as stated by the judge? THE FOREMAN: Not with regard to the law . . . . The question that was being debated very strongly was whether or what degree of impulsive action would be considered. THE JUDGE: I read you what the court said in a recent case, 1950. 'One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct, and neither is one who has the capacity to discriminate between right and wrong, but whose mind is in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease and render him incapable of resisting and controlling an impulse which leads to the commission of a crime.' His mind must be so diseased, his mentality so affected that his reason and conscious judgment are overwhelmed by this mental disease and render him

incapable of resisting the impulse to kill. Does that answer it? THE FOREMAN: I believe that answers the question."

The case from which the judge read was *Commonwealth* v. *McCann,* 325 Mass. 510, 515. Substantially similar instructions, with amplifications applicable to the evidence, were given in the charge. It is plain, therefore, that the jury were instructed on the issue of insanity in accordance with principles which have been part of our law since Chief Justice Shaw's charge to the jury in *Commonwealth* v. *Rogers,* 7 Met. 500. See *Commonwealth* v. *Johnson,* 188 Mass. 382, 388; *Commonwealth* v. *Cooper,* 219 Mass. 1, 4–5; *Commonwealth* v. *Stewart,* 255 Mass. 9, 13; *Commonwealth* v. *Trippi,* 268 Mass. 227, 230; *Commonwealth* v. *Clark,* 292 Mass. 409, 414–415; *Commonwealth* v. *Sheppard,* 313 Mass. 590, 594.

Counsel for the defendant has directed our attention to numerous articles and books in the fields of psychiatry and criminology discussing the question of insanity and criminal responsibility. Indeed, it is probably no exaggeration to say that this subject is receiving more attention today than any other subject in the criminal law. There seems to be one common theme running through these discussions and that is that the present state of the law on the subject in the Anglo-American system leaves much to be desired. See especially Report of Royal Commission on Capital Punishment 1949–1953, pages 110–111, 116, 285–287. A considerable portion of the criticism is aimed at the rule (which prevails in England and in the majority of States in this country)[1] laid down in the celebrated *M'Naghten's Case* in 1843. 10 Cl. & Fin. 200. But whether the M'Naghten rule has outlived its usefulness and ought to be abandoned is a matter we need not decide, for in this Commonwealth the M'Naghten rule, simpliciter, does not obtain. The test under the M'Naghten rule is the capacity of the accused to know what he was doing and to know that it was wrong. True, the rule of *Commonwealth* v. *Rogers,* 7 Met. 500, embraces the M'Naghten rule but it is considerably broader. Under *Commonwealth* v. *Rogers* a person

---

[1] See Model Penal Code (American Law Institute) Tentative Draft No. 4 (Appendix A).

may be able to discriminate between right and wrong yet his mind may be in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease to such an extent that he "acted from an irresistible and uncontrollable impulse." In such a case "the act . . . [is] not the act of a voluntary agent" and the person committing it is not criminally responsible. 7 Met. at page 502.

The defendant asks us in effect to abandon the rule of *Commonwealth* v. *Rogers* and to adopt the rule enunciated by the Supreme Judicial Court of New Hampshire in *State* v. *Pike*, 49 N. H. 399, 408. In substance that rule is that an accused is not criminally responsible if his unlawful act was the product of mental disease. A rule substantially similar was adopted in 1954 by the Court of Appeals for the District of Columbia in *Durham* v. *United States*, 214 F. 2d 862.[1] While the rule of the *Durham* case has been the subject of favorable comment[2] it has also been criticized by distinguished commentators.[3] The chief criticism directed against the Durham rule is that it leaves the words "disease," "defect" and "product" undefined. The broad language and ambiguities of the Durham rule were rejected by the American Law Institute in its Model Penal Code, and, instead, a more moderate rule was formulated to correct deficiencies thought to be inherent in the older rules. See Tentative Draft No. 4, pages 27, 156–192, especially at page 159.[4] So far as we can discover no court has followed

[1] The rule in the *Durham* case is slightly different in that it includes "mental defect" as well as "mental disease."

[2] Biggs, The Guilty Mind, pages 149–156. Sobeloff, Insanity and the Criminal Law: From M'Naghten to Durham and Beyond, 41 A. B. A. J. 793. 40 Cornell L. Q. 135.

[3] Wechsler, The Criteria of Criminal Responsibility, 22 Univ. of Chicago L. Rev. 367. Wertham, Psychoauthoritarianism and the Law, 22 Univ. of Chicago L. Rev. 336. Hall, Responsibility and Law: In Defense of the McNaghten Rules, 42 A. B. A. J. 917.

[4] The rule formulated by the American Law Institute in the Model Penal Code in § 4.01 is, "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." This provision was incorporated in a proposed draft act recommended by a majority of the Judicial Council. Report of Judicial Council for 1957, pages 56–69.

the Durham rule and at least two courts have expressly repudiated it. *Andersen* v. *United States*, 237 F. 2d 118 (C. A. 9). *Thomas* v. *State*, 206 Md. 575. See also illuminating discussions of the Durham rule by Judge Barnes in *Sauer* v. *United States*, 241 F. 2d 640, 645–649 (C. A. 9), and by Judge Brosman in *United States* v. *Smith*, 17 C. M. R. 314, 321–330. We do not labor under the illusion that the rule of *Commonwealth* v. *Rogers* is entirely satisfactory. Indeed, in this troublesome field there will be serious difficulties in any rule that can be formulated. The draftsmen of the Model Penal Code recognized this when they said "No problem in the drafting of a penal code presents larger intrinsic difficulty than that of determining when individuals whose conduct would otherwise be criminal ought to be exculpated on the ground that they were suffering from mental disease or defect when they acted as they did." Model Penal Code Draft No. 4 at page 156. We are not convinced that the rule of the *Pike* and *Durham* cases is a better rule than that of *Commonwealth* v. *Rogers*. Whatever may be said against the rule of *Commonwealth* v. *Rogers* and similar rules they at least have something that can be called a standard, albeit an imperfect one, to guide the triers of fact. The Durham rule leaves the triers with virtually none. We, of course, intend no intimation that the rule tentatively proposed by the American Law Institute in its Model Penal Code and which has been recommended favorably by a majority of the Judicial Council (see footnote 2 on page 1025) is not a desirable one, but no question touching that rule is before us.

We have reviewed the evidence with care, conscious of the grave responsibility placed upon us under G. L. c. 278, § 33E. That section "consigns the facts as well as the law to our consideration, gives us the power and the duty exercised by a trial judge upon a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice." *Commonwealth* v. *Cox*, 327 Mass. 609, 614. *Commonwealth* v. *Gricus*, 317 Mass. 403, 406–407. But, as we observed in the *Gricus*

case, the statute "does not . . . convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses" (page 406). We have set forth above in considerable detail the testimony of the psychiatrists. As frequently happens their opinions differed and it was peculiarly the province of the jury to resolve these differences. We cannot say in the light of the testimony that the verdict of guilty returned by the jury ought not to stand. Both in the court below and in this court the case on behalf of the defendant was conducted with diligence and skill. We are of opinion that justice does not require a new trial.

*Judgment affirmed.*