STATE of Missouri, Respondent,

v.

Sammie Gene GOZA, Appellant.

No. 46322.

Supreme Court of Missouri,
Division No. 1.

Nov. 10, 1958.

Donald C. Littleton, Martin Schriewer, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Arthur M. O'Keefe, Sp. Asst. Atty. Gen., for respondent.

DALTON, Judge.

Defendant was charged, tried and convicted of murder in the first degree and, in conformity to the jury's verdict, he was sentenced to be confined in the state penitentiary for the period of the remainder of his natural life. See Sections 559.010 and 559.030 RSMo 1949, V.A.M.S. He has appealed and assigns error on the giving of Instruction No. 4, requested by the State, and the refusal of Instruction "B" requested by defendant.

On arraignment, defendant had entered a plea of "not guilty", but he offered evidence tending to show that the alleged unlawful act could have been the product of mental disease or defect. The court construed this evidence to support the defense of "not guilty by reason of insanity." The jury was instructed with reference to that defense by the giving of Instruction No. 4. This instruction defined insanity, authorizing an acquittal, as "a physical disease located in the brain, which disease so perverts and deranges one or more of the mental and moral faculties as to render the person suffering from this affliction incapable of distinguishing right from wrong, in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the law." Instruction "B" offered by defendant and refused by the court would have told the jury that " * * * The test for determining insanity is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or defect. * * * If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was the product of such abnormality, then you must find the accused not guilty by reason of insanity."

The State's evidence tended to show that about 6:00 p. m., on May 20, 1956, the defendant went to the home of his estranged wife Dortha Mae Goza, 2946 North Fourteenth Street, St. Louis, Missouri, and was there arguing with her about money. He said he needed money to go across the river. His wife was ironing in the front room and a neighbor lady, Liza Hedrick, her two children and another child were present in the room. Defendant had been drinking, as was indicated by his walk, talk, appearance and conduct, and his wife told him to go into the bedroom and "sleep it off." He went to the bedroom, but returned within a minute or two and shot his wife in the back. The bullet passed through her left lung. As she ran out of the door, defendant shot her twice more, one bullet striking her in the arm and another in the sternum. She collapsed and died on the steps of a house across the street. Death was caused by the gunshot wound in her left lung. Immediately after defendant's wife ran from the room, defendant turned and shot Mrs. Liza Hedrick three times and then left the house. He placed the gun in an ash can at Thirteenth and Wright streets from which it was later recovered by the police. Defendant then took a taxicab to a tavern in East St. Louis, Illinois, but returned to St. Louis the same day and was arrested as he walked north on Broadway, about 8:19 p. m.

In a written statement given the police after his arrest, defendant stated that he had the .22 caliber revolver in his inside jacket pocket when he went to the house; that he expected to find his wife's ex-husband there and he was going to shoot him, if he found him. The wife's ex-husband had recently been released from the penitentiary and defendant said that he had been coming, about four times per week, to the house to see his children (children born to defendant's wife during her prior marriage). Defendant said that, when he (defendant) arrived at the house, his wife told him to "shove off", she didn't want to see him any

more, and that he went in and laid down on the bed and started thinking about what she had said, and the more he thought about it the madder he got, so he pulled out the gun and shot her.

Defendant did not take the stand in his own behalf. He offered one witness, who testified that defendant's reputation was good, and he then called Dr. Lawrence M. McCullough, a psychiatrist at Malcolm Bliss Psychiatric Hospital, as a witness. Dr. McCullough testified that, from his examination of the defendant and from the hospital reports, it was a possibility that defendant at time of the crime had a seizure and was incapable of understanding the nature of his act or whether it was right or wrong. In rebuttal, the State called Dr. Val Satterfield, a psychiatrist, who testified that he had examined the defendant and the hospital records, and that in his opinion the defendant at the time of the offense knew the difference between right and wrong.

While counsel for appellant have approved, as "substantially correct" and as "a reasonable statement concerning the facts of the case," the respondent's statement of facts in substantially the form hereinbefore set out, we think the statement inadequate to a full understanding of the particular issues presented.

Dr. McCullough's testimony further tended to show that defendant was admitted to Malcolm Bliss Hospital for examination on two occasions and two electroencephalograms were made or taken of defendant and reports issued thereon. The witness said "Well, the electroencephalogram is very similar to the electrocardiogram, except that the electrodes are placed in various points in the scalp, this then by means of a machine which amplifies these electric brain patterns; it shows the electricity that is given off by the brain and makes a record of it on the paper so that it can be looked at. And with various different kinds of brain disturbance you get different patterns. The normal brain gives a certain kind of pattern, and the disturbed brain gives different kinds of patterns." As to the report of the first electroencephalogram taken, the witness stated: "The waking record is not remarkable, but during drowsiness there are one or two spike discharges, a single and multiple. 'Impression: There is probable paroxysmal, nonfocal dysrhythmia. The record will have to be repeated to confirm this, and preferably with more seconal at the start.' This means that on the record there were several spikes which were abnormal, and this showed up particularly after the patient was given some sedation which slowed down the brain, and this brings out—often brings out things that will not be seen on a waking record."

With reference to the term "paroxysmal dysrhythmia" the witness said: "That means there is a dysrhythmia in the brain; in other words, it isn't a normal rhythm of the electrical pattern; and paroxysmal means that it comes in bursts or at intervals; it is not a consistent or constant thing, but you see them as bursts in the record." This report also indicated an old scar in defendant's scalp from a 1948 accident.

The report of the second electroencephalogram made under Dr. McCullough's supervision showed "During the drowsiness and light sleep there are spike discharges, mostly bilateral, a few on one side or the other. Sometimes these are multiple, or accompanied by large slow waves. * * * The Impression: Paroxysmal dysrhythmia with no persistent focus, highly consistent with organic cerebral involvement, and/or a convulsive disorder, including one manifested by psychomotor or atypical attacks."

The witness further said that the report indicated definite evidence of some sort of involvement in the brain causing the abnormal brain waves which were consistent with some brain damage, "or it is consistent with a type of epilepsy." The witness gave it, as his opinion, that the condition shown by the report of January 1957 had also existed at the time of the crime. He further said that alcohol "would certainly

make a patient more apt to have one of these kind of seizures * * * Now, as to whether he had one at that particular time, that I don't know, it would be impossible to tell definitely. * * * I would say that it is certainly a possibility that this could have occurred." He further stated: "In other words, a patient with alcohol may go on and have a seizure or make the seizure more apt to occur, and also if—if there is some—some perhaps emotional distress or psychological stress, this is more apt to cause a patient to have a (psychomotor) seizure also."

As to the amount of brain damage, he said: "This is not a large area that is involved: It appears that it is rather non-focal, no one particular one spot that is involved, it seems to be on both sides. * * * Well, I would say that it certainly is indicative that there is something wrong there, and that he could well have a type of seizure. * * * It—well, not exactly brain damage, but it indicates abnormal electricity coming out of the brain, and this is usually caused by brain damage. * * * Yes, the psychomotor epilepsy could possibly be a manifestation of the brain pattern like this, yes."

The witness also said that "psychosis is the medical term for insanity" and that the defendant was not psychotic at the time he was examined or when the report was prepared.

Dr. Val Satterfield, a physician (M.D.) specializing in psychiatry, who had examined defendant, testified on behalf of the State that defendant was not psychotic; also that he had examined the graphs, the electroencephalographs taken of defendant. He said: "The irregularities of the electroencephalographic tracings are not significant. The neurological examination is normal. Many individuals have similar irregularities and criminal behavior cannot be attributed to these common findings without other significant symptoms. * * * Yes, I expressed my opinion that he knew the difference between right and wrong. * * * He has the immature, inadequate personality of the longtime maladjusted personality." From a psychiatric examination of defendant, he said defendant knew "the difference between right and wrong. * * * The man does not have delusional beliefs and for that reason he is considered to be sane." The witness further reviewed his findings concerning defendant, as follows: "All of his social adjustments have been childish rather than vicious, immature rather than depraved. His immature personality is coupled with a limited and vague appreciation of his low capacity to replace what he loses. This emotional insecurity made for the gross stress reaction accountable for the alleged offense. * * * It was my opinion that this man has a very limited capacity to make satisfying adjustments for himself, both in the way of earning money and having a proper sort of relationship with women and friends. And that he got in this situation which got for him a wife and children and a satisfying social situation. Due to the return of her family to the city and the return of her former husband from the penitentiary, he believed that he was being squeezed out of this situation. And because of his immaturity and childishness and emotional characteristics, he—to put it in the vernacular, 'blew his top', didn't know what else to do as many people do." In response to hypothetical questions about defendant's "responsibility" at the time of the alleged offense, the witness said: "I would have the opinion that he was responsible."

At the time Instruction No. 4 was given and Instruction "B" refused, counsel for defendant stated: "Instruction No. 4 on insanity * * * is archaic and ambiguous because it asks simply the question of whether the accused knew right from wrong, whereas Instruction "B", if submitted, would give a clear indication of what insanity is, and what a disease is and what a defect is and it poses a very simple question of determining insanity in that the accused is not criminally responsible if

his unlawful act was a product of mental disease or defect."

The motion for new trial refers to Instruction No. 4 as giving "an archaic and misleading test for insanity, resulting in confusion and injustice" and complains that "it was error for the court to refuse to instruct the jury that the defendant may not be convicted for an act which was the product of mental disease as set forth in defendant's Instruction 'B', * * * as one could know right from wrong, know the quality of and the nature of his act, yet these factors alone, are not sufficient to make his act criminal, if the act is the product of a physical disease or mental defect located in the brain." .

■ The assignment of error set forth in the motion for a new trial with reference to the giving of Instruction No. 4 is inadequate in view of Supreme Court Rule 27.20, 42 V.A.M.S. (See State v. Johnson, Mo.Sup., 286 S.W.2d 787, 791; State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 309) ; but since a similar issue is presented by the refusal of defendant's Instruction "B", we shall consider the assignments together.

In oral argument before this court, counsel for appellant conceded that the cause was tried, submitted and ruled in accordance with the case law of this state as in force and effect at the time the cause was tried, but it is insisted that the case law of this state, as stated in Instruction No. 4, is erroneous; that this court should so declare the law and adopt a new rule of law applicable to the defense of insanity as stated in Instruction "B".

Appellant now contends: "The 'right and wrong test' as embodied in Instruction No. 4 turns on a specific and very limited symptom of insanity, which science no longer deems necessarily or even typically associated with most serious mental disorders. Only the most complete lunatic can be said to have no knowledge of right and wrong, and he almost never gets into the criminal courts. Judging the issue of insanity according to the right-wrong test exclusively is like saying as a matter of law that the only acceptable symptom in defining appendicitis is a pain in the abdomen and that no other diagnostic symptom is valid."

Appellant further states: "Instruction B, which was refused by the court, sets out as a test for insanity simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or defect and further instructs the jury that if they believed that he was suffering from a diseased or defective mental condition they should acquit him if they believed beyond a reasonable doubt that the act was the product of such abnormality, or on the other hand, if they did not believe beyond a reasonable doubt that the act was the product of such abnormality, they should find him guilty. This instruction which the court refused is in accordance with the modern and scientific facts on the question of insanity and should have been given if the law and science are to be in agreement."

■■ As stated, it is conceded by appellant that the trial court tried this cause in conformity to the case law of this state and applied the "right and wrong test" of insanity as long recognized by the courts of this state. "In Missouri and a majority of the other states the mental test for criminal responsibility is whether the accused was capable of distinguishing right from wrong as applied to the particular act. Mere irresistible impulse is not an excuse. In other words, we do not recognize the defense of 'volitional insanity' (meaning that although the accused can distinguish between right and wrong, still he is unable because of mental disease to resist the impulse to commit the criminal act)." State v. Jackson, 346 Mo. 474, 142 S.W.2d 45, 49; State v. Sapp, 356 Mo. 705, 203 S.W.2d 425, 431; State v. Hardy, 359 Mo. 1169, 225 S.W.2d 693, 698; State v. Murrell, Mo.Sup., 169 S.W.2d 409, 413; State v. Pinski, Mo.Sup., 163 S.W.2d 785, 787.

Appellant contends that we should reject the test approved, as stated, and require

a new trial with directions that the test recommended in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874–875, 45 A.L.R.2d 1430, be used. Appellant also cites State v. Pike, 1869, 49 N.H. 399 (which was followed in State v. Jones, 1871, 50 N.H. 369). Appellant also refers to the dissenting opinion in United States v. Baldi, 3 Cir., 192 F.2d 540, 549–566. The dissenting opinion in that case concedes that "most of the States make the sole test of legal irresponsibility the ability of the accused to tell the difference between right and wrong," but it further states: "The human mind, however, is an entity. It cannot be broken into parts, one part sane, the other part insane. The law, when it requires the psychiatrist to state whether in his opinion the accused is capable of knowing right from wrong, compels the psychiatrist to test guilt or innocence by a concept which has almost no recognizable reality. * * * We can see no reason why the legal test of irresponsibility for the commission of a crime should not be based upon the principle that if the mental illness of the accused is the proximate, or a contributory cause of the crime, then the accused may not be found guilty of murder.

In State v. Pike, supra, the Supreme Court of New Hampshire held (June term 1869) that an accused is not criminally responsible if his unlawful act was the product of mental disease. The court approved the giving of an instruction stating that "whether there is such a mental disease as dipsomania, and whether defendant had that disease, and whether the killing of Brown was the product of such disease, were questions of fact for the jury." In effect, "the court instructed the jury that all tests of mental disease are purely matters of fact, and that if the homicide was the offspring or product of mental disease in the defendant, he was not guilty by reason of insanity." The same rule was followed in State v. Jones, 50 N.H. 369, where the court held that where insanity is set up as a defense to an indictment for murder, the jury must be satisfied beyond

a reasonable doubt that the killing was not produced by mental disease.

In 1954, in the case of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 874, 45 A.L.R.2d 1430, the United States Circuit Court of Appeals for the District of Columbia said "that as an exclusive criterion the right-wrong test is inadequate in that (a) it does not take sufficient account of psychic realities and scientific knowledge, and (b) it is based upon one symptom and so cannot validly be applied in all circumstances * * * that the 'irresistible impulse' test is also inadequate in that it gives no recognition to mental illness characterized by brooding and reflection and so relegates acts caused by such illness to the application of the inadequate right-wrong test * * * that a broader test should be adopted." The court held that the rule to be applied on the retrial of the case and in future cases was not unlike that followed by the New Hampshire courts since 1870. "It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect." And see Stewart v. United States, 94 U.S.App. D.C. 293, 214 F.2d 879, decided by the same court.

Many courts have since considered at length the rule stated in the Durham case, but they have refused to follow it. Reference may be had to the opinions hereinafter referred to concerning their grounds for refusal.

In the case of Sauer v. United States, 9 Cir., 241 F.2d 640, 645, 652, the court said: "The test adopted in the Durham case is not new. It is based almost wholly, as the court itself recognized, on the decisions in two old New Hampshire cases. Those cases were decided over eighty years ago. Yet the majority of no other American court, until the Durham case, and no State Legislature, saw fit to accept that formulation of the rule of criminal responsibility. And it is interesting to note, that the three appellate Federal courts

which have considered the question since the Durham decision was handed down, have all rejected that approach. * * *

"But it is not for this court to undertake a drastic revision in the concept of criminal responsibility, a task which would necessitate a searching analysis of philosophies, purposes, and policies of the criminal law, and which might substitute freedom of insane persons for either confinement or commitment. If change there is to be, it must come from a higher judicial authority, or from the Congress."

In Leland v. State of Oregon, 1952, 343 U.S. 790, 800, 801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302, decided prior to the Durham case, the U. S. Supreme Court had used the following language: "Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's case (10 Cl & Fin 200 H.L. 1843), but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it."

In Andersen v. United States, 9 Cir., 237 F.2d 118, 127, the court said: "This Court has no desire to join the courts of New Hampshire and the District of Columbia in their 'magnificent isolation' of rebellion against M'Naghten, even though New Hampshire has been traveling down that lonesome road since 1870. See State v. Pike, 49 N.H. 399. Rather than stumble along with Pike, we prefer to trudge along the now well-traveled pike blazed more than a century ago by M'Naghten."

For other authorities considering and refusing to follow the Durham case, see Flowers v. State of Indiana, 236 Ind. 151, 139 N.E.2d 185, 194; State v. Kitchens, 129 Mont. 331, 286 P.2d 1079, 1082; Thomas v. State, 206 Md. 575, 588, 112 A.2d 913; People v. Ryan, 140 Cal.App.2d 412, 295 P.2d 496, 504; United States v. Smith, 5 U.S.C.M.A. 314, 17 C.M.R. 314; Howard v. United States, 5 Cir., 232 F.2d 274, 275.

In approving an instruction based on what is generally known as the "right-wrong test", the Supreme Court of Maryland in Thomas v. State, supra, 206 Md. 575, 582, 112 A.2d 913, 916, quoted with approval from a prior opinion of that court [Spencer v. State, 69 Md. 28, 13 A. 809], as follows: "There has been and is still a great variety of opinion entertained upon this subject, and especially among members of the medical profession who have written upon the subject of medical jurisprudence. Doubtless the subject has been much elucidated by the repeated discussions that have taken place. But, in the courts of justice where definite principles, and not mere theories, must be given practical application, and that, too, with a view to the safety of society, as well as for the protection of the particular individual accused, tests that have received the sanction of experience, and the approval of the ablest jurists of our age, must be accepted and applied as the established law. And according to the law as we find it settled by the great preponderance of judicial authority, if the party accused be competent to form and execute a criminal design, or, in other words, if, at the time of the commission of the alleged offense, he had capacity and reason sufficient to enable him to distinguish between right and wrong, and understand the nature and consequences of his act as applied to himself, he is a responsible agent, and amenable to the criminal law of the land for the consequences of his act. This is the leading test as applied by the courts of England, and certainly by a very large majority of the courts in this country."

**616**

For those interested in a further study of the issues here presented, the authorities herein cited may be consulted for reference to publications favorable or critical of the rule announced in the Durham case. We believe that a further discussion of the authorities is unwarranted at this time.

■ It seems to us that the rule contained in Instructions "B", authorizing an acquittal if defendant's act was the "product" of mental disease or mental defect is, in effect, no rule at all, since it fails to give the jury any sufficient guide as to what constitutes mental disease or mental defect. An instruction which submits the defense of insanity to the jury in such general terms is wholly inadequate to guide the jury in choosing between conflicting theories of experts in the psychiatric field as these experts attempt to determine the criminal responsibility of the accused. While Instruction "B" would have told the jury that insanity was a physical disease; that "disease" was used in the sense of a condition "which is considered capable of either improving or deteriorating"; that "defect" was used "in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease"; and while it would have further advised that "if you believe he was suffering from a disease or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty," yet one can only guess as to the varying interpretations that might reasonably have been given to the words "disease", "defect" and "product." Under such instructions as Instruction "B" the jury in each case would be free to determine what degree of abnormality would afford exemption from punishment. Such a rule might well fail to provide adequate protection for the public. The fact of the survival of what is commonly referred to as the "right and

wrong" test for well over a century in the great majority of jurisdictions in this country is strong evidence that it has operated satisfactorily to protect both the accused and public. We see no reason to depart from the test submitted in Instruction No. 4. We believe that it has operated satisfactorily in this state. The court did not err in giving Instruction No. 4 or in refusing Instruction "B".

We have further examined the entire record and find no error respecting the sufficiency of the indictment, the verdict, judgment or sentence. Allocution was duly granted.

The judgment is affirmed.

All concur.