STEWART *v.* STATE.

4996                                        345 S. W. 2d 472

Opinion delivered April 17, 1961.

[Rehearing denied May 15, 1961.]

*Thad D. Williams* and *Harold B. Anderson,* for appellant.

*J. Frank Holt,* Attorney General, by *Thorp Thomas,* Asst. Attorney General, for appellee.

J. SEABORN HOLT, Associate Justice. The appellant, Clarence Stewart, Jr., a Negro, was charged by information with the crime of first degree murder. The jury returned a verdict of guilty and punishment was assessed at death. William N. Caldwell was an elderly, partially crippled man who owned and operated a small auto parts store in the city of North Little Rock. On January 8, 1959, around noon his body was discovered in his store by a customer. An investigation revealed that Mr. Caldwell had been stabbed nineteen times with six of the knife wounds penetrating the heart. The county coroner testified that death was due to hemorrhaging from multiple knife wounds. A hunting knife was removed from the body. Subsequent investigation by police officers led to the arrest of Clarence Stewart, Jr., the following evening, January 9, 1959. After questioning, Stewart admitted stabbing Mr. Caldwell with the knife found in the body. Later Stewart led police to the spot where he had discarded a tackle box stolen from Caldwell's place of business. Inside the box was found a government check in the amount of $51.61 payable to Mr. Caldwell, a property tax assessment slip in Caldwell's name, and a burial insurance policy. After showing officers the location of the tackle box, Stewart instructed the officers to drive to the home of Ellis Thomas and there, about

seventy-five yards from the house, Stewart's billfold containing $29.00 stolen from Caldwell was found. The billfold also contained the appellant's social security card which reflected that he was born February 23, 1938. About a mile and a half from the appellant's home, Stewart told the police officers to stop their car and they were led to a spot where Caldwell's billfold was recovered. Approximately three-quarters of a mile from Caldwell's billfold the appellant showed the officers where he had torn up and discarded the papers taken from Caldwell's billfold. Half of a social security card and other papers of Caldwell's were found. Stewart was charged with the crime of first degree murder. A trial was had and the jury returned a verdict of guilty and assessed the penalty at death. This appeal comes from that judgment.

First, the appellant argues for reversal that insanity caused by a defect or deficiency in the mind is a valid defense and relies upon the case of *Durham* v. *United States,* 94 U. S. App. D. C. 228, 214 F. 2d 862, 45 A. L. R. 2d 1430. However, the *Durham* rule has been expressly rejected in this state in *Downs* v. *State,* 231 Ark. 466, 330 S. W. 2d 281, and in many other jurisdictions which have had an opportunity to pass upon the question. See: *People* v. *Ryan,* 140 Cal. App. 2d 412, 295 P. 2d 496; *Castro* v. *People,* 140 Colo. 493, 346 P. 2d 1020; *State* v. *Taborsky,* 147 Conn. 194, 158 A. 2d 239; *Piccott* v. *State,* Fla., 116 So. 2d 626; *People* v. *Carpenter,* 11 Ill. 2d 60, 142 N. E. 2d 11; *Flowers* v. *State,* 236 Ind. 151, 139 N. E. 2d 185; *Commonwealth* v. *Chester,* 337 Mass. 702, 150 N. E. 2d 914; *State* v. *Finn,* 257 Minn. 138, 100 N. W. 2d 508; *State* v. *Goza,* Mo., 317 S. W. 2d 609; *State* v. *Kitchens,* 129 Mont. 331, 286 P. 2d 1079; *Sollars* v. *State,* 73 Nev. 248, 316 P. 2d 917; *State* v. *Lucas,* 30 N. J. 37, 152 A. 2d 50; *Commonwealth* v. *Novak,* 395 Pa. 199, 150 A. 2d 102; *State* v. *Goyet,* 120 Vt. 12, 132 A. 2d 623; *State* v. *Collins,* 50 Wash. 2d 740, 314 P. 2d 660. The instruction [No. 13 on insanity] given in the present case was taken from *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186, and set out the law of insanity as a

defense to a criminal action as recognized in this state as follows: "State's Requested Instruction No. 13. You are instructed that before insanity can be a defense, it is necessary for you to believe, by a preponderance of the evidence, first, that at the time of the alleged crime the defendant was under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, second, if he did know it, that he did not know that he was doing what was wrong, or, third, if he knew the nature and quality of the act and knew that it was wrong, that he was under such duress of mental disease as to be incapable of choosing between right and wrong as to the act done and unable, because of the disease, to resist the doing of the wrong act which was the result solely of his mental disease." The defendant objected to the action of the court in giving the State's Requested Instruction No. 13 and at the time asked that his exceptions be noted of record, which was accordingly done. "Mr. Williams: We specifically object to the State's Instruction No. 13 because it does not consider deficiency or disorder or defect." Three psychiatrists testified as to Stewart's mental capacity and all agreed that the appellant was mentally dull but that he was without psychosis and knew right from wrong. In addition the report of the Arkansas State Hospital's examination was introduced in evidence which agrees in all particulars with the above testimony and further adds that Stewart was probably not mentally ill, to the degree of legal irresponsibility, at the time of the alleged commission of his acts. The fact that one has a mind below normal does not exempt him from punishment for his criminal acts. *Ezell* v. *State*, 217 Ark. 94, 229 S. W. 2d 32.

Second, the appellant argues that the admission in evidence of photographs of the deceased and other photographs showing the premises were prejudicial. The introduction of photographs rests largely within the discretion of the trial judge, *Oliver* v. *State*, 225 Ark. 809, 286 S. W. 2d 17; *Lee* v. *State*, 229 Ark. 354, 315 S. W. 2d 916, and are admissible for the purpose of describing and identifying the premises which were the scene of a

crime. See *Zinn* v. *State*, 135 Ark. 342, 205 S. W. 704; *Simmons* v. *State*, 184 Ark. 373, 42 S. W. 2d 549; *Underhill, Criminal Evidence* (5th ed.) § 117. Photographs may also be admitted to establish the corpus delicti of the crime charged, to disclose the environment of the crime at the time it was committed, and to corroborate testimony. *Wharton's Criminal Evidence* (11th ed.) § 773. The photographs introduced in evidence in the present case meet one or all of the above conditions and were clearly admissible.

Third, appellant says: "Defendant's requested Instruction Number 18 asked that the death verdict have the following form, to-wit: 'We the jury, find the defendant guilty of murder in the first degree, as charged in the information and fix his punishment at death by electrocution.' However, the court below amended the form for the death verdict by striking 'and fix his punishment at death by electrocution.' The jury returned a death verdict in the form as instructed by the court. After giving the death verdict form the court instructed the jury that: 'this form of verdict automatically carries the death penalty with it.' However the verdict itself does not prescribe the punishment and this defect is not cured by an instruction from the court. If the verdict itself has spelled out the punishment then there would be no doubt the jury alone has returned a death verdict." This contention is without merit. It is well settled in this state that where the jury finds the defendant guilty of first degree murder as charged in the information and does not set the punishment, then the law fixes the punishment at death. *Bullen* v. *State*, 156 Ark. 148, 245 S. W. 493; *Clark* v. *State*, 169 Ark. 717, 276 S. W. 849; *Smith* v. *State*, 205 Ark. 1075, 172 S. W. 2d 248. It should also be pointed out that the jury was instructed they could return a verdict of life imprisonment if they so desired.

Finally, it is argued that the jury panel should have been quashed because of discrimination in the selection of the panel. Though it is not clear from appellant's brief, evidently this argument is based upon the proposition that systematic *inclusion*, as alleged, would be a denial of

due process and equal protection of the law under the Fourteenth Amendment to the Federal Constitution. We find it unnecessary to pass upon this argument since we think the evidence fails to show a systematic inclusion of Negroes on jury panels which would amount to discrimination. In fact, the evidence demonstrates that the jury commissioners made a special effort to avoid discrimination in the selection of veniremen. Discrimination in a jury's selection must be proved; it is not to be presumed, *Tarrance* v. *Florida,* 188 U. S. 519, 23 S. Ct. 402, 47 L. Ed. 572, and the burden of establishing the discrimination is upon the defendant. *Akins* v. *Texas,* 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692. The fact that there is a disproportion in the number of a particular race selected does not in itself show discrimination, *Akins* v. *Texas, supra,* and a defendant has no absolute right to have his race represented on any particular jury. *Bush* v. *Kentucky,* 107 U. S. 110, 1 S. Ct. 625, 27 L. Ed. 354. To prove discrimination in the present case the defendant took the testimony of the county collector, the deputy circuit court clerk, and two of the jury commissioners. The collector was called and testified as to the number of poll tax receipts issued. No record could be had in prior years but the collector estimated there were 88,176 poll taxes issued in 1959 in Pulaski County and of that number perhaps 20,000 to 25,000 were sold to members of the Negro race. The deputy circuit clerk was called and testified that since the March term of 1940 through the March term of 1960 Negroes had served on the jury panels of Pulaski County. A tabulation of the number of Negroes serving on the jury panels in the first division of the Pulaski County Circuit Court shows that in 1955 a total of ten, in 1956 a total of six, in 1957 a total of fifteen, in 1958 a total of three, in 1959 a total of seven, and on the March term regular jury panel three Negroes were appointed. Mr. Edward Granoff, the first jury commissioner to testify, stated that he sought to select persons who would make good jurors and he and the other jury commissioners used the city directory and looked to see if people were qualified and used the poll tax book to see if "they were paid

up'' and the jury list was used to see if the selected persons had served recently. He further testified that it was the desire of the jury commissioners to select some Negroes ''so they would have a say in the government of our county.'' He stated he didn't pick the jury panels on a personal basis—just who he thought was best qualified. Mr. Jack L. Branch, the second jury commissioner to testify, said that the commissioners didn't have any figures and didn't know what the proportion of Caucasian to Negro poll tax holders would be, but that he and the other commissioners thought that there should be some Negroes on the jury panels so they could represent the county government. The third jury commissioner was not called to testify. This was all the testimony presented to show discrimination in the selection of the jury panels. Viewing this testimony as a whole, we think that it fails to establish any systematic, planned exclusion or inclusion of Negroes which would amount to unconstitutional discrimination in the selection of the jury panels. The American tradition of trial by jury contemplates an impartial jury drawn from a cross section of the community. The United States Supreme Court in the case of *Strauder* v. *West Virginia,* 100 U. S. 303, 25 L. Ed. 664, noted: ''* * * (T)he constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds.'' We do not think it ground for complaint that Negroes were on the jury panel.

In the present case the appellant has proceeded in *forma pauperis* on this appeal and only four points are argued in his mimeographed brief but as is our duty in capital cases, we have not only considered each assignment of error, but also each objection made in the trial court by the defendant for error. *Rorie* v. *State,* 215 Ark. 282, 220 S. W. 2d 421. We find none.

The judgment is affirmed.