Clarence STEWART, Jr., Petitioner,

v.

Lee HENSLEE, Superintendent of Arkansas State Penitentiary, Respondent.

No. LR 62 C 22.

United States District Court
E. D. Arkansas, W. D.

June 12, 1962.

Wiley A. Branton, Pine Bluff, Ark., Harold B. Anderson, Little Rock, Ark., for petitioner.

Thorpe Thomas, Asst. Atty. Gen., J. Frank Holt, Atty. Gen., Little Rock, Ark., for respondent.

YOUNG, District Judge.

Clarence Stewart, Jr., a Negro, was charged by information filed by the prosecuting attorney for Pulaski County, Arkansas, with murdering William N. Caldwell on January 9, 1959. He was tried by a jury at the March 1960 term in the Circuit Court, First Division, Pulaski County, Arkansas, found guilty of first degree murder, and in due time was sentenced to death.

This judgment was affirmed by the Supreme Court of Arkansas, Stewart v. State, Ark., 345 S.W.2d 472, and on December 4, 1961, certiorari was denied by the Supreme Court of the United States, 368 U.S. 935, 82 S.Ct. 371, 7 L.Ed.2d 197. On February 5, 1962, Stewart sought relief in the federal court by petition for writ of habeas corpus filed in the United States District Court for the Eastern District of Arkansas, Western Division. On the same date an order was issued by that court requiring the Superintendent of the Arkansas State Penitentiary, respondent herein, to show cause why writ of habeas corpus should not issue, and the execution of Stewart was stayed.

A hearing on the petition for writ of habeas corpus was held in the district court on February 19, 1962. Petitioner Stewart was present and was afforded full opportunity to be heard and to offer testimony.

In seeking discharge from custody petitioner contends that his conviction was obtained as a result of deprivation of his Constitutional rights as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

Petitioner filed a written amendment to his petition and at the hearing counsel orally amended further. I believe that petitioner's claims are best expressed in the language of his counsel in their brief. They are:

"(1) Members of petitioner's race were intentionally, deliberately and systematically limited in the selection of petit jury panels.

"(2) Petitioner is a Negro and members of his race were deliberately and intentionally discriminated against in the selection of petit jury panels.

"(3) The jury commissioners allowed race to be considered as a factor in the selection of the petit jury panel.

"(4) The jury commissioners made no special effort to acquaint themselves with Negroes who were qualified for jury service.

"(5) The defendant's confession was made without benefit of counsel."

The question of the guilt of petitioner is not an issue. It is, therefore, unnecessary to discuss the facts and circumstances attending commission of the crime. They are reported in Stewart v. State, supra.

The question of whether members of the Negro race were deliberately and intentionally limited and excluded in the selection of petit jury panels in the Circuit Court, First Division, Pulaski County, Arkansas, in violation of the Federal Constitution was considered in detail by the United States Court of Appeals for the Eighth Circuit in Bailey v. Henslee, March 17, 1961, 287 F.2d 936. In that case the court discussed in detail the racial composition of juries in that court from 1953 through the March term in 1960, which is the term at which Stewart was convicted. We regard that case as controlling, therefore, in passing upon this petition.

At the outset we should observe that the racial composition of juries in the First Division of the Pulaski Circuit Court introduced in the record in this case includes the years 1940 through March 1960, while the Bailey case included similar statistics from 1953 through March 1960.

No question of *exclusion* of Negroes is involved. As stated in Bailey, there has been representation of the Negro race on the regular petit jury panel on each of the terms which have come and gone in the Pulaski County Circuit Court, First Division, from March 1953 through March 1960. The actual number of Negroes has varied from one to three. There were 31 instances of a Negro juror on the regular panel of the fifteen terms during that seven and one-half year period. At each term, in addition to the regular panel of 24 petit jurors, an alternate panel of twelve was called. During that period no Negroes appeared on the alternate panels. In addition, twenty-nine Negroes served on special panels used in that court during that same period of time, and of that number five Negroes out of fifty special petit jurors were called at the term when Stewart was tried in March 1960.

We come, then, to the question of whether members of petitioner's race were deliberately and intentionally limited in the selection of petit jury panels. Bailey made nine factual findings, pp. 946, 947, which, it is said "(L)ead us to the conclusion that a prima facie case of limitation of members of the Negro race in the selection of this defendant's petit jury panel was established, that the State did not rebut it, and that the

District Court's conclusion to the contrary was clearly erroneous. Here there appears to be a definite pattern of race selection; here there is a device for race identification with its possibility of abuse; here there is exclusion from the alternate panels and from the special panels actually used; here there is an element of recurrence of the same Negro names; and here there is the additional factor, for what atmosphere it may provide, of exclusion from the civil divisions' panels."

We believe that the facts in this case may best be compared with those in Bailey by setting forth the nine factual findings in Bailey and comparing them with the facts developed at the hearing of this petition. The paragraphs numbered 1 through 9 are quotations from Bailey. The paragraphs numbered 1a, 2a, etc. reflect facts developed in this case relating to the same subject matter.

"1. Since 1939 no Negro has ever served on any kind of panel, regular, alternate or special, in the Second or Third Divisions[1] of the Pulaski County Circuit Court. A fact of this kind, as has been noted above, would support a conclusion that a prima facie case of discrimination in the selection of juries in these civil divisions has been established."

1a. There is no proof in the record of this case in regard to the composition of juries in these civil divisions.

"2. The First Division's panels of alternates, from 1952 to 1960, with one possible exception, contained no Negro name. Here again it can be said that this fact creates an unrebutted prima facie case of discrimination in the selection of these alternates."

2a. The proof in this case reflects that the First Division's panels of alternates from 1952 to 1960 contain no Negro names. In 1941 one Negro was an alternate juror; in 1946, one; in 1951, three for the two terms; otherwise, no Negroes served on alternate jury panels during the years 1940 to 1952, inclusive.

"3. The 5 special panels assembled for the March 1956 term in the First Division, which contained an aggregate of approximately 450 names, included, according to the stipulated Exhibit 1, the name of no Negro."

3a. Of course, this particular point is not so important in our case because Stewart was tried at the March 1960 term. At that term, of the 50 special jurors called, 5 were Negroes.

"4. Fourteen of the persons on the defendant's own petit jury panel of 37 names came from those 2 special panels consisting exclusively of white persons."

4a. According to the testimony, at the March 1960 term, with which we are primarily concerned, there were three Negroes on the regular panel of 24 jurors, none on the alternate panel of 12, and five on the special panel of 50. Exhibit B, which purports to be the list of special jurors, includes D. B. Lacefield as one of the five Negro special jurors. D. B. Frederick, deputy circuit clerk, in his testimony, included the name of Lacefield as one of the three Negroes on the regular panel. There is no explanation for this apparent duplication. Although the record is not entirely clear, it appears that Stewart's jury panel included the regular, the alternate, and at least a portion of the special panel.

"5. Over the years presented no more than 3 Negroes appeared in any regular panel of 24 persons. At the most (6 of 15 times) therefore, Negroes have represented one-eighth of the total. This is a little less than what the evidence seems to show, at least for 1954 and 1955, to be the proportion between the races for persons holding the qualifying poll tax receipts. We recognize, of course, that mere lack of identity in proportions is not in itself unconstitutional."

5a. The evidence shows here that over those years, that is 1953 through March 1960, no more than three Negroes ap-

---

[1]. These two divisions try only civil cases.

peared in any regular panel of 24 persons, and at the most (6 of 15 times) Negroes have represented one-eighth of the total. The evidence also shows that Negroes have appeared on the regular panels in each year from 1940 through 1951, inclusive, the numbers ranging from one to six per term except for 1941, the March terms in 1944 and 1945, the September term of 1947, and the two terms in 1952. There were no Negroes on the regular panels for those terms.

There is no evidence in this record as to the proportion between the races for persons holding the qualifying poll tax receipts for 1954 and 1955. Robertson, the Collector of Pulaski County, testified that there were 88,176 poll taxes issued in 1959, the year which would qualify jurors for the March 1960 term as far as poll taxes are concerned. He said there was no accurate way to determine the percentage issued to colored or white in any one year, that in 1959 colored people bought more poll taxes than they ever purchased in the history of Pulaski County, and this had been true for four years, although in 1959 they purchased in larger numbers. When asked specifically the percentage in 1959, his reply was "It would be just a guess. This is purely and simply a guess, but I would say that last year there was between 20,000 and 25,000 poll tax receipts issued with a 'c' on it." In other years the percentage would be much lower. Back six years ago "there wasn't one out of every fifty." [2]

"6. There is an unexplained and seemingly unusual amount of repetition of the names of Negroes which do appear on the regular panels from 1953 to 1960 and which in the aggregate made up the 31 instances. A. E. Nabors, who was named in September 1955, was named again in September 1957 and in March 1960. D. B. Lacefield, who was named in September

1955, was also named in March 1958 and March 1960 (he had been named, too, in March 1951). Simon Herron, who was named in March 1956, was also named in September 1958. W. E. Hayes, who was named in September 1955, was named again in March 1959. I. S. McClinton, who was named in March 1957, was also named in September 1959 (he had been named, too, in March 1951). Vilma T. Nabors, who was named in September 1956, was the wife of A. E. Nabors. The 31 names for the 1953–60 period thus come down to only 24 different persons and 2 of these are husband and wife."

6a. The record in this case is identical.

"7. The Pulaski County poll tax receipts were given racial marks. They contained a 'C' when the holders were known to be colored and a 'W' when they were known to be white. Where race was unknown, as was often the case when payment of the tax was made by mail, they were marked 'W'."

7a. This is also true in this case. Arkansas law requires that poll tax holders be identified by color. Ark.Stat. § 3–227.

"8. The jury commissioners, except, perhaps, for two terms, themselves identified names of Negroes on the lists by the designation '(C)' or '(Col)' or '(Colored)'. Why this was done does not appear. There is testimony, as is usually the situation in these cases, that this was of no persuasion so far as the jury commissioners were concerned."

8a. It is true in this case that for the same period of time the jury commissioners identified names of Negroes on the lists.

"9. The testimony of the jury commissioners as to their efforts to ascertain the names of qualified Negroes leaves much to be desired."

2. Subsequent to the hearing in this case, the Arkansas State Auditor released through the press February 1, 1962, statistics showing poll tax holders in the various counties in the state for several years by race. It reflected that Pulaski County in 1959 had 81,184 poll tax holders, of which 69,169 were white and 12,015 were colored, or a ratio of slightly more than six to one. These figures, of course, are not a part of the record in this case.

9a. In Bailey the substance of the testimony of the jury commissioners was they made no special effort to include Negro jurors nor to exclude them. In this case Commissioner Granoff said that no special investigation was made of jurors but that an attempt was made to select people who would be best qualified. He wanted to have some Negroes on the panel so "they would have a 'say' in the government of our county." It was desired to give Negroes a proportionate representation. Commissioner Branch testified that a special effort was made to see that there were some Negroes on the panel. Enough were picked, according to him, to give them representation in the "county government".

There is a detailed discussion in Bailey of the cases that have dealt with this problem, and there is no reason to repeat that analysis here.

In summary, there appears little difference in the record in this case from that in Bailey. This is not surprising because, as stated above, the record in Bailey included the petit jury panels in the Pulaski County Criminal Division from March 1953 through March 1960.

It is true that the first point set out by Bailey, that since 1939 no Negro had served on any of the civil panels in Pulaski County, does not appear in the record in this case. The Court of Appeals did not appear to give this point particular emphasis. It was the last of the facts stated to have influenced the court in rendering its decision, and it was thus characterized in Bailey, "* * * and here there is the additional factor, for what atmosphere it may provide, of exclusion from the civil divisions' panels."

I think we may properly make the observation that the only reason that factor is not present in this record is because petitioner failed to make the showing.

It is true that the commissioners who testified in this case said that they made a special effort to see that Negroes had representation on the jury panels. Unfortunately their efforts still resulted in the pattern of three Negroes on the regular panel of 24, and no Negroes on the alternate panel of 12.

Perhaps the most important difference with Bailey is that no Negroes were on the panels of special jurors in that case, while here the commissioners included five Negroes on the special panel of 50, or a ratio of ten percent.

I have come reluctantly to the conclusion, however, that the differences between this record and Bailey are not sufficient to avoid the same result reached in Bailey, that is, a determination that the procedure followed in Stewart's trial in the method of jury selection does not measure up to the standards of the equal protection clause of the Fourteenth Amendment as interpreted by the United States Supreme Court.

The other issue which petitioner raised dealt with his confession. In view of the decision on the jury question, it is not necessary to pass on this contention.

As also stated in Bailey, p. 948, this result does not mean that Stewart need go free, "The State of Arkansas is at liberty to try him again upon the same information by procedure which meets Constitutional requirements."

The State of Arkansas is given seven months from the date this opinion is filed in the Office of the Clerk of this Court to retry Stewart. If, for good cause shown, it becomes impossible or inappropriate to try him within that period of time, application may be made to this court by either Stewart or the State for a reasonable extension of time.

It is impractical to prescribe an appropriate period of time if this case be appealed, but in such event, we assume the appellate court will make further orders prescribing a time limit which will be suitable under the circumstances.

If Stewart is retried, the court will enter dismissal of Stewart's present petition for release on habeas corpus. If he is not retried within the period prescribed in this opinion, or within such other

period of time as may be set by an appellate court, his petition for a writ of habeas corpus will be granted.

Pending a retrial by the State, a stay of execution will issue.