Clarence **STEWART**, Jr., Petitioner,

v.

Dan D. **STEPHENS**, Superintendent of Arkansas State Penitentiary, Respondent.

No. PB–65–C–2.

United States District Court
E. D. Arkansas,
Pine Bluff Division.
July 23, 1965.

Harold B. Anderson, Little Rock, Ark., Wiley A. Branton, Pine Bluff, Ark., for petitioner.

Bruce Bennett, Atty. Gen., John P. Gill, Asst. Atty. Gen., Little Rock, Ark., for respondent.

GORDON E. YOUNG, District Judge.

This habeas corpus proceeding is brought by petitioner. Clarence Stewart, Jr., a Negro, to set aside his second conviction for murder.[1] He received a death sentence. His conviction was affirmed by the Supreme Court of Arkansas in the case of Stewart v. State, 237 Ark. 748, 375 S.W.2d 804.[2]

The chronological facts, so far as here pertinent, show that on January 8, 1959, the employees of R. E. Caldwell's Service Station in North Little Rock, Arkansas discovered the body of William N. Caldwell lying on the floor of his auto parts store. Upon investigation the North Little Rock Police discovered that Mr. Caldwell had been stabbed to death with a hunting knife which was still protruding from his chest. To learn the identity of the owner of the knife, the North Little Rock Police caused a picture of the knife to be run in the newspapers and over television with a request that anyone having any knowledge of the knife contact the North Little Rock Police Department. About 6:00 p. m. on January 9, 1959, the police were informed by a Mr. Tull at Scott, Arkansas that he thought he had some information with respect to the identity of the owner of the knife. Lt. Cecil Hammer of the North Little Rock Police Department and Officers McDonald and Tracy with the Arkansas State Police went to Tull's Service Station at Scott, Arkansas. Upon arriving, the officers were directed to an informer,[3] who told them that he thought the knife belonged to a Pete Redman. The officers drove to Redman's house, where Redman informed them that he did own a hunting knife but that he had lent it to Clarence Stewart about a week before and that Stewart had not returned the knife. The officers then made arrangements to take Pete Redman to Police Headquarters at North Little Rock to identify the knife. He directed the officers to the home of Clarence Stewart, but Stewart was not home when they arrived. Lt. Hammer remained at the home of Stewart and the other two officers prepared to take Redman to North Little Rock Police Headquarters for the purpose of identifying the knife. At the suggestion of Redman, who indicated that he thought he knew where Clarence Stewart was visiting, the officers went by the Ellis Thomas, Sr., residence and asked if Stewart was there.

1. Petitioner's first conviction was affirmed by the Supreme Court of Arkansas in Stewart v. State, 233 Ark. 458, 345 S.W. 2d 472, but this Court issued a writ of habeas corpus on the ground that a denial of constitutional rights had resulted from a systematic and arbitrary exclusion of Negroes from the petit jury, Stewart v. Henslee, 206 F.Supp. 137 (E.D.Ark. 1962), aff'd 8 Cir., 311 F.2d 691. However, the State was given the right to retry him.

2. Petition for certiorari was denied on December 7, 1964, by the Supreme Court of the United States, Stewart v. State, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 345.

3. The informer did not want his identity to be known.

After Ellis Thomas, Sr., found out why the officers were looking for Stewart, he called for his son, Ellis Thomas, Jr. As a result, two individuals—Thomas, Jr., and Stewart—approached from some heavy underbrush at the rear of the Thomas home.[4] Stewart and Thomas, Jr., then accompanied the officers in the State Police car, and, after going by the Stewart home to pick up Lt. Hammer, proceeded to the North Little Rock Police Headquarters, where Stewart allegedly made certain statements.[5]

In his petition, Stewart alleges that his constitutional rights were violated in the following particulars:

1. That he was charged by an information drawn by the prosecuting attorney instead of by an indictment of a grand jury as required by the Constitution of the United States.

2. That Negroes have been systematically excluded as jury commissioners.

3. That petitioner is now insane and was insane before the crime was committed.

4. That race was a factor in selecting the jury at his trial and that it was so drawn upon a racially proportionate basis as to discriminate against petitioner because of his race.

5. That his alleged confession was coerced.

 Since it appeared that petitioner had exhausted his State remedies, this Court issued a stay of execution, and in accordance with the duties and burdens [6] imposed upon the federal district courts by the decisions of the United States Supreme Court in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837; Town-

---

4. The manner in which petitioner Stewart was placed in custody is described in the testimony of Officer McDonald on direct at p. 313 of the State Court Record, and on cross at pp. 325 to 334.

5. The alleged confessions are set out more fully under the discussion on the coercion issue.

6. Under those decisions, this Court in determining the right of a habeas corpus applicant to personal liberty must keep in mind:

1. That this Court is not concerned with the guilt or innocence of the petitioner, but only with whether he has been deprived of any right guaranteed to him under the Constitution and laws of the United States;

2. That the State Court's adjudication of a federal claim is not conclusive but carries only the weight that federal practice gives to the conclusions of a court of another jurisdiction on federal constitution issues;

3. That jurisdiction of this court to adjudicate the petitioner's federal claims is not affected by procedural defaults incurred by the petitioner during the state court proceedings except in those rare instances when he, after consultation with competent counsel, or otherwise, has understandingly and knowingly bypassed the privilege of seeking to vindicate his federal claims in the state courts;

4. That in any case where the habeas corpus petitioner alleges facts which if proved would entitle him to relief, this Court must grant a full and plenary evidentiary hearing where:

(a) the merits of the factual dispute were not resolved in the state court hearing;

(b) the state factual determination is not fairly supported by the record as a whole;

(c) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

(d) there is a substantial allegation of newly discovered evidence;

(e) the material facts were not adequately developed at the state court hearing; and

(f) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

5. And that since controlling weight may not be given to a prior denial of an application for habeas corpus unless the prior determination was made on the merits, the applicant must be urged to present all of his federal claims in one proceeding to prevent the possibility that this Court will be used to thwart, or at least procrastinate the orderly enforcement of the state's criminal laws through the use of successive applications by a state prisoner.

send v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770; and Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, the petition was set down for a plenary hearing on February 25, 1965. At this hearing, the petitioner rested after the transcript of the proceedings in the State Court was made a part of the record here. The respondent called as witnesses Leo Grant, V. H. Williams, and Paul McDonald.[7]

## CHARGE BY INFORMATION:

■ The petitioner's contention with respect to being charged by information filed by the prosecuting attorney instead of by a grand jury indictment is without merit. See Moore v. Henslee, 276 F.2d 876, 878 (8th Cir. 1960), where the Court said:

> "* * * The Supreme Court of the United States has consistently recognized that state prosecutions initiated by the filing of an information by the Prosecuting Attorney, here authorized by Ark.Const. Amend. 21, do not violate the constitutional rights of the accused under the Fourteenth Amendment. Hurtado v. People of State of California, 110 U.S. 516, 538, 4 S.Ct. 111, 292, 28 L.Ed. 232 * * *."

## RACIAL DISCRIMINATION IN SELECTION OF JURY COMMISSIONERS:

■ The petitioner's contention that his constitutional rights have been violated because Negroes have been systematically excluded as jury commissioners is without merit. The identical argument here made by petitioner was con-

sidered in Moore v. Henslee, 276 F.2d 876, 879 (8th Cir. 1960), and there determined adversely to petitioner's present contention. That decision is binding upon this Court until overruled by that court or the Supreme Court of the United States.

## INSANITY ISSUE:

Petitioner offered no testimony on the issue of insanity in this Court other than the transcript of his trial in the State Court,[8] and has not argued the issue in the briefs submitted herein. However, notwithstanding this apparent abandonment of the issue, this Court has carefully reviewed the transcript of the proceedings in the State Court[9] and finds that the issue of insanity was fairly submitted to the jury.

Dr. Fletcher testified that petitioner's I.Q. was low (63) and that she felt he was definitely mentally affected and his judgment impaired. On the other hand, she said that he was competent and not psychotic on the days that she examined him.

Dr. Crow, a specialist in psychiatry on the staff of the Arkansas State Hospital, testified about three reports made by the staff of the hospital, in all of which he participated. He said that three different tests on Stewart's I.Q. were taken and they varied—that I.Q. is just one link in the chain that determines whether or not he is competent or responsible. In Dr. Crow's opinion petitioner knows right from wrong and was not suffering from any disease of the mind. He has a mind capable of logical reasoning, capable of adjusting to his environment without supervision or control.

---

7. Witnesses Leo Grant and V. H. Williams are two of the three jury commissioners who selected the jury panels from which the petit jury which tried petitioner was selected. Witness Paul McDonald is one of the officers who picked up petitioner at the Ellis Thomas home. Officer McDonald's testimony during petitioner's state trial appears in the St.Ct.Tr. beginning at p. 307.

8. Specific inquiry by this Court was made of petitioner's counsel as to whether any additional evidence was going to be presented on the issue of insanity.

9. Petitioner was examined by the Staff of the Arkansas State Hospital for Nervous Diseases on March 17, 1959, March 22, 1960, and again on July 9, 1963 (See St. Ct.Tr. p. 371). Petitioner was also examined by Dr. Elizabeth Fletcher, a psychiatrist of his own choice (See St.Ct.Tr. p. 347 to 365).

Actually, petitioner's alleged insanity at the time of commission of the offense, which was one of the issues of his trial, cannot be raised in this proceeding. The same standards govern habeas corpus proceedings as those involving a motion by a federal prisoner under 28 U.S.C.A. § 2255, Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). The judgment of conviction embraced a determination of that question adverse to the defendant and it is well settled that the issue is not one which can be raised or considered by such a proceeding as this one. Bradley v. United States, 347 F.2d 121 (8th Cir. 1965).

However, the Court has gone into the testimony in regard to this issue because petitioner claims mental incapacity in connection with his assertion that his confession or admissions were coerced.

The evidence in the record preponderates in favor of the respondent's position that petitioner was legally responsible for his acts and conduct,[10] and this Court so finds.

## SELECTION OF JURY:

Petitioner alleges that his constitutional rights were violated in the selection of the jury (1) because race was a factor in the selection of the jury panels by the jury commissioners (i. e., the jury was selected on a racially proportionate basis), and (2) because the total number of Negroes placed on the jury was less than the peremptory challenges given the State,[11] the State could (as it usually did) exercise its challenges so as to prevent any Negroes from serving on the jury.

In accordance with Arkansas law,[12] the State Court at the beginning of each biannual term of court appoints three jury commissioners to select the regular, alternate and special jury panels for the use of the court. In this instance the First Division of the Circuit Court of Pulaski County, Arkansas selected Mr. Roy Beard, a retired City Collector for the City of Little Rock, Arkansas; Mr. Leo Grant, manager of a tire distributorship; and Mr. V. H. Williams, president and business manager of a local union.

The record is ambiguous with respect to how many colored jurors were summoned to serve on the regular and special panels used in making up the petit jury which convicted the petitioner. The petitioner says in his brief there were six or seven on the regular panel and three on the special panel—the Arkansas Supreme Court arrived at a total of eleven.[13] The record does show that there were 29 petit jurors on the regular panel, but there is no showing of how many jurors were on the special panel.[14] Some of the Negro jurymen were excused by the court because they did not believe in capital punishment. Of the remainder, the petitioner used a peremptory challenge to excuse one,[15] and the Prosecuting Attorney peremptorily challenged those remaining—at least one of whom was a personal acquaintance of counsel for petitioner.[16]

Mr. Roy Beard and Mr. Leo Grant were called to testify in connection with petitioner's motion in the State trial court to quash the jury panel.

Mr. Beard's testimony there contained the following:[17] In answer to a question whether or not he made any special effort to acquaint himself with the proportionate number of Negro voters in the county in comparison with the number of white voters, he answered, "We have

---

10. Petitioner still has available a State remedy for the determination of his alleged insanity following his conviction, see Ark.Stats. § 43–2621 et seq.

11. Ark.Stats. § 43–1921.

12. Ark.Stats. § 22–310 and § 39–201 et seq.

13. Stewart v. State, 237 Ark. 748, 753, 375 S.W.2d 804.

14. 51 persons were examined on the voir dire before the petit jury was selected. St.Ct.Tr. 20–22.

15. St.Ct.Tr. 165.

16. St.Ct.Tr. 151.

17. St.Ct.Tr. 24–29.

attempted to get 25%, a minimum of 25%, of the colored qualified electors." On cross-examination, in answer to the question whether his testimony was to the effect that he tried to put "proportionately to population" that number of Negroes on the jury, his answer was, "Our intention has been to do that."

Yet later he testified:

"Q Now, after the number of regular and alternate special panel jurors has been selected, do you and the other jury men then go into the number of Negroes and the number of whites? I mean, do you then, after you have picked them, all go in and count the number of Negroes that you have on there?

"A No."

In the State court trial Mr. Leo Grant said that his testimony would be along the same line as Mr. Beard's as to the selection of the jurors.[18]

In this Court, Mr. Grant testified that he attempted to get jurors from all parts of the county, that in so doing he used poll books, city directories and telephone books; that he never attempted to get a maximum or minimum number of persons of either race on the list; and that he was present when Mr. Roy Beard made his statement in the State trial court but that he did not take his testimony to mean that the jury commissioners had limited the number of Negroes on the jury to 25%.

Mr. V. H. Williams testified in this Court that race was not a factor in the selection of the jury by the commissioners and that his main concern in selecting the jury was to be sure that the jury was a geographically representative group.

Mr. Beard was not called as a witness.

In Bailey v. Henslee, 287 F.2d 936 (8th Cir. 1961), Judge Blackmun discussed in detail the general principles to be followed in determining the existence of racial discrimination in a jury. In the Bailey case racial discrimination was found to exist based on nine factors present in that case. Briefly, they were:

(1) Since 1939 no Negro had ever served on any panel in the civil divisions of the Pulaski Circuit Court (some of the jurors from the civil division were called into service in the criminal division during that term);

(2) The criminal division's panels of alternates from 1952 to 1960, with one possible exception, contained no Negro names;

(3) The five special panels assembled for the criminal division during that term, 450 names in all, included the name of no Negro;

(4) Fourteen of the persons on the defendant's own petit jury panel of 37 names came from two special panels consisting exclusively of white persons;

(5) Over the years presented, no more than three Negroes appeared in any regular panel of 24 persons;

(6) There was an unexplained and seemingly unusual amount of repetition in the names of Negroes who did appear on the regular panels;

(7) The Pulaski County poll tax receipts were given racial marks, containing a "C" when the holders were colored and a "W" when they were white;

(8) The jury commissioners themselves identified names of Negroes on the jury lists by the designation "C" or "Col";

(9) The testimony of the jury commissioners themselves "leaves much to be desired."

Even with those factors present, Judge Blackmun indicated in Bailey that "this case may be a close one."

The only factors mentioned in Bailey which may be found to exist in this case

18. St.Ct.Tr. 29–30.

were (1) poll tax lists designated the holders of such poll taxes by race, and (2) the testimony of one of the jury commissioners is not entirely satisfactory.

■ At the time of the selection of Stewart's jury, Arkansas law required designation of poll tax holders by race. Ark.Stat.Ann. § 3–227 (Repl. 1956). This legal requirement no longer exists. This alone is not sufficient to show unlawful jury discrimination. Maxwell v. Stephens, 348 F.2d 325 (8th Cir. 1965).

The testimony of jury commissioner Beard is somewhat confusing. He intimates in one answer, which was not responsive to the question asked him, that he tried to get a minimum of 25% Negroes on the jury, and in answer to another question said he tried to get proportionate representation. On the other hand, he testified that after the regular and alternate panels had been selected neither he nor the other commissioners counted the number of Negroes that had been placed on such panels.

Commissioner Grant indicated in the State Court in answer to a general question that his testimony would be along the same line as commissioner Beard. But at the hearing in this Court when he was asked more detailed questions he testified that he resorted to poll books, city directories, and telephone books, and that he did not attempt to get a maximum or minimum number of persons of either race on the list; and the third commissioner, Williams, who testified only before this Court, said that race was not a factor used by the commissioners, but that his principal concern was to see that the jury was geographically representational as far as the county was concerned.

In this somewhat confused state of the record it seems to the Court that what the jury commissioners did and the results they obtained is more important than their testimony as to the manner in which they proceeded.

Here there were ten or eleven Negro jurors on the regular and special panels from which petitioner's jury was chosen. There is no testimony in the record as to the proportionate number of Negro poll tax holders as compared with white ones, nor is there any testimony as to the number of jurors on the alternate or special panels. The Court is not convinced that any proportionate number of Negroes were included on the jury—in fact, the Court finds to the contrary.

■ In petitioner's brief it is said that the total number of Negroes placed on each panel is a number lower than the number of peremptory strikes given the prosecutor by Arkansas law [19] "and the record indicates that the prosecutor almost always exercises these challenges to rid the jury of Negroes". But the record does not show that. In this case, as has been said above, some of the Negro jurors were excused by the court because they did not believe in capital punishment. A number were struck by the State, and one was excused by the petitioner. The matter of discrimination through the peremptory challenges of the prosecuting attorney was fully discussed in Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The exercise of peremptory challenges of the prosecuting attorney in this case clearly did not make out a case of discrimination.

■ The evidence falls far short of establishing that racial discrimination was practiced in the selection of the jury panel, as petitioner contends. This Court is convinced that his federal right to a jury selected without regard to race was fully preserved at his trial and that his argument to the contrary is without merit.

19. Ark.Stats. § 43–1921 gives the prosecution ten peremptory challenges where the offense is punishable by death or life imprisonment.

CONFESSION AND ADMISSIONS: [20]

The testimony shows that the officers located Stewart about 7:30 p. m. and then proceeded to the North Little Rock Police Headquarters with Pete Redman, Ellis Thomas, Jr., and petitioner.[21] This took something more than thirty minutes. The knife was first shown to Pete Redman, in the absence of Stewart, who identified it as the knife which Redman had loaned to Stewart.[22] When petitioner Stewart was brought into the room, in the presence of Redman, he at first denied any knowledge of the knife. It was at this point that Redman began remonstrating with Stewart because Stewart had denied borrowing the knife, and it was in response to this on the part of Redman that Stewart said, "I stobbed (sic) him, I was forced to stob him." [23] In response to questions from the officers, Stewart said two colored men made him stick the knife in Mr. Caldwell.[24]

At approximately 9:00 p. m., after Stewart had told the officers that he knew where certain missing articles were, officers McDonald, Tracy and Hammer, together with Pete Redman, Ellis Thomas, Jr., and petitioner Stewart started back to Scott, Arkansas.[25] On the way, Stewart directed the officers to the railroad track, where a tackle box which had been taken from the deceased was recovered; to the Ellis Thomas residence, where his own billfold with two five dollar bills and the nineteen one dollar bills [26] had been hidden by him earlier in the evening (immediately before he was taken into custody); and to a location on Slaughter Road where Mr. Caldwell's billfold and personal papers were found.

After the officers arrived back at headquarters from their trip to Scott, petitioner Stewart, in response to questions from the same officers as to why he killed Mr. Caldwell,[27] stated that he had been uptown and wanted to buy an automobile for which he needed $30.00. He said he left home intending to get the money and was going to rob somebody. He stopped in Mr. Caldwell's place because he knew him and did business there and while standing there talking to him about a generator he decided to rob him. He just took the knife and stuck it in his back while he was standing there beside him, and because Mr. Caldwell kept moving his arms he kept stabbing him. He took the billfold and the tackle box, walked out on the highway and caught a ride with a fellow named Lipsie.[28]

Shortly thereafter petitioner made a sworn written statement to the prosecuting attorney.[29] However, this statement was not introduced nor read into the evidence.

On January 10, 1959, the next day after petitioner was taken into custody, petitioner Stewart told Officer Dennis L. Jones that he had not told the truth in his statements, that another boy did it, and he had told that he did it, that is, admitted the murder, to cover up for

---

20. Testimony with respect to confession and admissions was given by Officer Hammer (St.Ct.Tr. 250), by Officer Jones (St. Ct.Tr. 236), Officer McDonald (St.Ct.Tr. 314) and by Ellis Thomas, Jr. (St.Ct.Tr. 303). Officer McDonald also testified before this Court.

21. St.Ct.Tr. 313.

22. St.Ct.Tr. at pp. 250 and 314.

23. Officer McDonald so testified before this Court. Officer Hammer gave a slightly different version (St.Ct.Tr. 250).

24. Petitioner subsequently changed this story when confronted with the persons with whom he caught a ride. (St.Ct.Tr. 260).

25. St.Ct.Tr. 251.

26. Petitioner stated that this was all of the money he got from Mr. Caldwell (St. Ct.Tr. 254).

27. St.Ct.Tr. 263–265.

28. J. C. Lipsie was called as a witness for the State. (St.Ct.Tr. 285).

29. St.Ct.Tr. 261.

the other boy.[30] This, of course, was not a confession, but a disclaimer of the crime. The account of this conversation did not occur during direct examination, but was brought out by the defense on cross. These are all the statements or admissions alleged to have been made by petitioner that were introduced into evidence at his trial.

In the State Court, petitioner, before trial, moved to suppress the admissions made to the police officers on the grounds that he was interrogated without benefit of counsel, that he was not warned of his constitutional rights, and that he lacked the mental capacity to comprehend the nature of his acts.[31]

ESCOBEDO v. ILLINOIS:

Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is relied upon by petitioner to support his contention that the confessions were not admissible because made in the absence of counsel.

The facts in Escobedo v. State of Illinois, supra, show that Escobedo was arrested early the next morning after his brother-in-law was shot and interrogated until sometime late in the afternoon, when his lawyer obtained his release under a state court writ of habeas corpus. Ten days later he was again taken into custody between 8:00 p. m. and 9:00 p. m. On this occasion Escobedo repeatedly requested to talk to his lawyer and once saw him through an open door but was told by the police that his lawyer did not want to see him. During this same time petitioner's lawyer was attempting to see him but was told by the police that he could not see petitioner until the police were through interrogating him. During this later interrogation, Escobedo confessed, and the Court in holding it inadmissible said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335] at 342, 83 S.Ct. [792] at 795 [9 L.Ed.2d 799], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

The respondent takes the position that Escobedo v. State of Illinois, supra, is not applicable (1) because at the time of the confession the officers were conducting a general inquiry into the crime involved, (2) because petitioner did not request counsel, and (3) because the exclusionary rule set out therein should not be applied retroactively.

The facts show that at the time of petitioner's first incriminating statement to the officers, the officers had possession of the knife used in killing Mr. Caldwell; that Pete Redman had told the officers that the knife belonged to him but that he had loaned it to petitioner; and that petitioner had denied borrowing the knife. At this point it is obvious that the confrontation of Redman and petitioner was a logical step for the officer to take, for at this time Pete Redman had not been exculpated.

It is true that the evidence does not show that petitioner was informed of his right to counsel before his alleged admissions (other than his confession to the prosecuting attorney) were made. Some of the cases have extended Escobe-

---

30. St.Ct.Tr. 238.

31. Petitioner makes substantially the same argument here.

do to the extent of saying that any admissions obtained without benefit of counsel during a post-arrest interrogation are excluded, even though counsel had not been requested. Other courts have held to the contrary.

There are these differences between Escobedo and the case under consideration:

Here, petitioner did not request an opportunity to consult with counsel; and perhaps equally important, the crucial admission alleged to have been made by petitioner that, "I stobbed (sic) him," was not in response to any interrogation by the officers, but when Redman, his co-suspect, remonstrated with Stewart because the latter had denied borrowing Redman's knife. There had been no prolonged interrogation—there is no testimony in the State record or the record here that petitioner was treated by the officers at any time other than with consideration. In fact, when Stewart made that crucial admission, Redman, and not Stewart, was the prime suspect because it had already been established—and in fact Redman had admitted—that the knife found in the deceased's body belonged to Redman. Thus, the investigation had not shifted from the investigatory to the accusatory stage. After the admission, according to the testimony, Stewart readily agreed to show the officers where certain missing articles were to be found, and after returning from locating those articles gave the officers more details of the crime. All of this transpired within two or three hours.

■ Petitioner did not take the stand either in the State Court trial nor in the proceedings before this Court, and there is simply no testimony to indicate any coercion of him in any way, and the circumstances surrounding these admissions do not dictate a contrary finding. The Court holds, therefore, that Escobedo is not applicable.

Petitioner's conviction was in the ordinary appellate process when Escobedo was decided and it would be unnecessary under any circumstances to decide whether Escobedo should be applied retroactively or not.

Petitioner contends in connection with the voluntariness of his admissions of the written confession that he was without intelligence, intellect, or training to understand the consequences of his acts, and says in support of that contention that the record shows that the psychiatrist testified that Stewart had no more than six weeks' education. The record does not show that.

At p. 382 of the State Court record, Dr. Crow testified that Stewart told him that he went to school from age 6 to age 16, that he attained the sixth grade, that he went to a Little Rock school and one other school, although he attended intermittently. The reference to six weeks comes on the next page of the transcript where Dr. Crow said that Stewart had completed six weeks of school at Scott and that he, the doctor, sent a social service worker to that school to check Stewart's statement. The doctor also said in this connection in discussing Stewart's education on p. 382. "He got up to the sixth grade. He read simple things. He could tell time, count money, compute simple problems in a logical manner, and was able to hold employment."

### JACKSON v. DENNO:

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). This case presents an entirely different problem. It arose from denial of a petition for habeas corpus by the lower federal courts, and held that under the Due Process Clause of the Fourteenth Amendment an accused questioning the voluntariness of a confession is entitled to an independent determination by the trial judge on the issue of voluntariness, out of the presence of the jury.[32] The petitioner in Denno had been convicted in the New York State Court. The New York procedure used in admitting the confession

---

32. See Trotter v. Stephens, 241 F.Supp. 33 (E.D.Ark.1965) for a more thorough discussion of Jackson v. Denno, supra.

into evidence is one that had been previously approved by the United States Supreme Court in Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), that is, if the voluntariness of the confession presented a fair question of fact the trial court was required to receive the confession and leave to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness.

While ruling that the failure of the trial court to make an independent determination of the voluntariness of the confession violated Jackson's constitutional rights and that the issue was one that should first be determined by the state court rather than the federal district court on a petition for habeas corpus, the Court in Jackson v. Denno, supra, held that there was no constitutional necessity of a new trial for Jackson but that if the State of New York chose to do so it could hold an evidentiary hearing only on the issue of voluntariness of the confession and that if the confession were found at the evidentiary hearing to have been voluntarily given, there would be no necessity for giving Jackson a new trial.[33]

Respondent contends that Jackson v. Denno, supra, is not applicable because (1) Arkansas does not follow the New York procedure in the admission of confessions; (2) the decision in Jackson v. Denno, supra, should not be applied retroactively; (3) the petitioner has waived his State Court remedy by not applying for a full evidentiary hearing in the state courts; and (4) the petitioner has not exhausted his State remedies.

Respondent's first contention is not supported by the record, which fails to show an independent determination of the voluntariness of the admissions.[34]

Petitioner's motion to suppress "confession" was overruled without comment by the trial court, and the question of voluntariness was submitted to the jury. Here, like under Escobedo, it is not necessary to decide whether or not the Denno holding is retroactive. Denno is controlling here because petitioner's case was in the ordinary appellate process at the time Denno was decided.

Respondent's contention that petitioner has waived his right to an independent evidentiary hearing on the issue of voluntariness is based upon the premise that a state post-conviction procedure was available by which the petitioner could have obtained a full evidentiary hearing on the issue of voluntariness of the confession.[35] Even if such a post-conviction procedure did exist in Arkansas, this Court would treat the problem as one of not having exhausted his state remedies instead of waiver, for the Court is unable to see anything in petitioner's conduct that would not entitle him to an evidentiary hearing, Fay v. Noia, supra.

While respondent contends that petitioner has not exhausted all of his State Court remedies, it has furnished no authority for any such remedy under the laws of Arkansas. Nor does this Court interpret Denno as providing a State Court remedy.[36] Consequently this contention is found to be without merit.

Thus, notwithstanding the respondent's contentions, it follows that

33. See also Boles v. Stevenson, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964), and Henry v. State of Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

34. St.Ct.Tr. 12.

35. In Swagger v. State, 227 Ark. 45, 296 S.W.2d 204 (1956) it was held that a void criminal conviction could be vacated by the trial judge at any time. However, any supposed post-conviction procedure resulting from that decision was severely restricted, if not completely eliminated, by Mitchell v. State, 232 Ark. 371, 337 S.W. 2d 663 (1960), which limited the Swagger case to those cases which had not been appealed.

36. Contra, United States ex rel. Milford v. McMann, 231 F.Supp. 731 (N.D.N.Y. 1964).

petitioner Clarence Stewart, Jr., has been deprived of his constitutional rights as set out in Jackson v. Denno, supra. Since no hearing was held and no independent determination was made on the issue of voluntariness of the confession, he is now entitled to a full evidentiary hearing to determine that issue. However, under Denno, and Boles v. Stevenson, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed. 2d 109 (1964) that determination cannot be made by this Court but must be initially made by the State Court.

■ If the State trial court, at an evidentiary hearing, determines that the admissions were voluntarily made, then there is no constitutional necessity of a new trial for Stewart and the jury verdict against him may stand; on the other hand, a determination that the admissions were involuntary would require that Stewart be given a new trial to determine his guilt or innocence without testimony of the admissions being admitted into evidence. Of course, the State is free to give Stewart a new trial if it so chooses without an evidentiary hearing on the voluntariness of the admissions, but there is no constitutional requirement to this effect. See Trotter v. Stephens, supra.

The State is given seven months from June 30, 1965 to either allow the trial court to conduct a hearing on the issue of voluntariness of Stewart's confession or to retry him. If, for good cause shown, it becomes impossible or inappropriate to try him within that period of time, application may be made to this Court by either Stewart or the State for a reasonable extension of time.

If Stewart is given a hearing to determine the issue of voluntariness or if he is retried, the Court will enter dismissal of Stewart's present petition of habeas corpus. If Stewart is not given such a hearing—or, if the State elects, a new trial—within the period prescribed in this opinion, or within such other period of time as may be set by an appellate court, Stewart's petition for habeas corpus will be granted.